UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, <br> ALLSTATE INDEMNITY COMPANY, <br> ALLSTATE FIRE & CASUALTY INSURANCE COMPANY, <br> AND <br> ALLSTATE PROPERTY & CASUALTY INSURANCE <br> COMPANY, <br> <div align="center">Plaintiffs,</div> <br> vs. <br> COMMUNITY MEDICAL IMAGING, P.C., <br> COMMUNITY MEDICAL IMAGING OF BROOKLYN, P.C., <br> ANDREW J. MCDONNELL, M.D., <br> GRIGORIY VAYNSHTEYN, <br>     a/k/a GREGORY VAYNSHTEYN, <br> AND <br> GLOBAL STONE ASSOCIATES, INC., <br> <div align="center">Defendants.</div> | C.A. No. |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

The plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company, and Allstate Property & Casualty Insurance Company (collectively, "Allstate" and/or "plaintiffs"), by their attorneys, King, Tilden, McEttrick & Brink, P.C., allege as follows:

## I.   INTRODUCTION

1.     The Defendants defrauded Allstate by using medical professional corporations ("PCs") named Community Medical Imaging, P.C. ("CMI") and Community Medical Imaging of Brooklyn, P.C. ("CMIBK") (collectively, "PC Defendants") to collect payments under New York's No-Fault laws.

1

2.      Although CMI and CMIBK were nominally owned by Andrew J. McDonnell, M.D. ("McDonnell"), they were actually operated and controlled by an unlicensed person named Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn ("Vaynshteyn"), which is against New York law because unlicensed persons are not allowed to own or control medical PCs.

3.      Vaynshteyn achieved control over CMI and CMIBK through a series of sham agreements and transactions involving a company named Global Stone Associates, Inc. ("Global Stone"), which owned the equipment and facility space used in this scheme.

4.      The scheme was designed to strip control of CMI and CMIBK from McDonnell, but also to exploit New York's No-Fault laws, which provide insurance coverage to persons ("claimants") involved in automobile accidents.

5.      New York is an ideal venue for this scheme because every claimant is eligible for at least $50,000.00 in coverage for medical expenses.

6.      Claimants can assign their No-Fault benefits to medical providers, and the providers can then seek No-Fault payments directly from the claimant's insurer.

7.      However, medical providers are not eligible to collect No-Fault payments if they fail to comply with any applicable licensing laws and regulations.

8.      Unlicensed persons are prohibited from owning, controlling, or profiting from medical PCs under New York law.

9.      Medical PCs such as CMI and CMIBK are prohibited from sharing their professional fees with unlicensed persons.  Providers are also forbidden from engaging in professional misconduct, including billing for unnecessary treatments and tests.

10.     Here, the Defendants conspired to operate and control CMI and CMIBK in violation of New York law.

11.     McDonnell was nothing more than the nominal owner of CMI and CMIBK.  The companies were controlled by others while McDonnell spent time elsewhere.

12.     McDonnell has been continually employed as a Medical Officer at the Veterans Health Administration ("VHA") throughout this scheme.  McDonnell reportedly works full-time at the VHA's hospital in Bath, NY, which is located over 300 miles away from CMI and CMIBK's imaging facilities, and is one of the highest-paid employees in the entire VHA:



13.     In reality, Vaynshteyn controlled CMI and CMIBK, and siphoned off their professional fees, which is against New York law.

14.     CMI and CMIBK also submitted hundreds of fraudulent bills to Allstate seeking No-Fault payments for radiology services.

15. CMI and CMIBK's bills are fraudulent and non-compensable because the services were not medically necessary.

16. The Defendants created and submitted statutory claim forms (i.e., NF-3 bills) that falsely certified CMI and CMIBK's eligibility to collect No-Fault payments under New York law even though they knew that CMI and CMIBK were illegally operated and controlled and ineligible to collect No-Fault payments.

17. Allstate reasonably relied on the facial validity of the records and bills mailed by CMI and CMIBK—and the representations contained therein—when making payments on CMI and CMIBK's No-Fault claims.

18. The Defendants knew that CMI and CMIBK's No-Fault claims were false and fraudulent because the bills and documents submitted to Allstate in support of the claims misrepresented or omitted material facts about CMI and CMIBK's rights to be paid under New York's No-Fault laws.

19. The success of the Defendants' scheme to defraud relied on the transmission to Allstate, through the U.S. Mail, of invoices, bills, and other No-Fault claim documents warranting the PC Defendants' eligibility to collect No-Fault payments under New York law.

20. As detailed below, the PC Defendants were never eligible to seek or collect No-Fault benefit payments from Allstate during the relevant period for the following reasons:

a. CMI and CMIBK were unlawfully operated, managed, and controlled by an unlicensed person who was not authorized to (i) provide medical services, (ii) own or control a professional service corporation authorized to provide medical services, or (iii) profit from a professional service corporation organized to provide medical services;

4

b.      CMI and CMIBK split professional fees with unlicensed persons, which is against New York law;

c.      CMI and CMIBK billed for unnecessary diagnostic imaging services, which is against New York's No-Fault laws;

d.      CMI and CMIBK took part in unlawful referral arrangements and then billed for services that arose from those agreements, which is against N.Y. Pub. Health Law § 238-a; and

e.      CMI and CMIBK charged excessive rates for unnecessary services in violation of the applicable fee schedule.

21.     Allstate was damaged by CMI and CMIBK's fraudulent No-Fault claims.

22.     By this Complaint, Allstate brings claims against the Defendants for: (a) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq*.; (b) common-law fraud; and (c) unjust enrichment.

23.     Allstate seeks actual damages in excess of $964,190.00, which represent No-Fault payments that Allstate was wrongfully induced to make to CMI and CMIBK during the course of this scheme.

24.     Allstate also seeks a declaration pursuant to 28 U.S.C. § 2201 that it is not legally obligated to make any further payments to CMI and CMIBK (or their agents) in connection with any No-Fault claims submitted to Allstate.

25.     All of the acts and omissions of the Defendants described throughout this Complaint were undertaken purposely, knowingly, and intentionally.

26.     The Defendants purposely designed and executed this fraudulent scheme to elicit payment of automobile insurance contract proceeds from Allstate to, or for the benefit of, the Defendants.

27.     In each claim detailed throughout this Complaint and in the accompanying Exhibits, an Allstate automobile insurance contract was the platform upon which the Defendants sought—and in many instances obtained—payment for medical services that were not compensable under New York's No-Fault laws.

28.     The Defendants knew that the patients identified in this Complaint were eligible for insurance coverage pursuant to automobile insurance policies issued by Allstate.

29.     Allstate estimates that the Defendants, in furtherance of this scheme, purposely and knowingly submitted hundreds of bills on behalf of CMI and CMIBK knowing that the bills were not compensable under New York's No-Fault laws.

## II.    **THE PARTIES**

### A.    **PLAINTIFFS**

30.     Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company, and Allstate Property & Casualty Insurance Company are corporations duly organized and existing under the laws of the State of Illinois, each having their principal place of business in Northbrook, Illinois.

31.     At all times relevant to the allegations contained in this Complaint, Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company, and Allstate Property & Casualty Insurance Company were authorized to conduct business in New York.

B.   DEFENDANTS

1.   **Andrew J. McDonnell, M.D.**

32.   McDonnell resides in and is a citizen of the State of New York.

33.   McDonnell is licensed to practice medicine in the State of New York.

34.   McDonnell was falsely held out to the public and to Allstate as the sole officer, director, and shareholder of CMI and CMIBK during the course of this scheme.

35.   McDonnell has a history of conspiring with Vaynshteyn in No-Fault fraud schemes. *Nationwide Affinity Ins. Co. of Am. v. Professional Health Imaging, P.C.*, Index No. 600407/2016 (N.Y. Sup. Ct., Nassau Cnty.); *Liberty Mut. Ins. Co. v. Community Medical Imaging, P.C.*, Index No. 653508/2015 (N.Y. Sup. Ct., New York Cnty.); *21st Century Ins. Co. v. Professional Health Imaging, P.C.*, Index No. 156583/2015 (N.Y. Sup. Ct., New York Cnty.); *GEICO v. Bakst*, No. 15-cv-00537-ARR-JO (E.D.N.Y.).

36.   McDonnell participated in the operation and management of CMI and CMIBK during the relevant period, and is therefore responsible for the fraudulent and non-compensable medical services billed in connection with the claimants at issue in this Complaint.

2.   **Grigory Vaynshteyn a/k/a Gregory Vaynshteyn**

37.   Vaynshteyn resides in and is a citizen of the State of New York.

38.   Vaynshteyn is an unlicensed person, and is not authorized to practice medicine in the State of New York.

39.   Vaynshteyn is not allowed to own or control a medical PC.

40.   Vaynshteyn has been implicated in prior No-Fault schemes, including actions involving CMI and its predecessor, non-party Professional Health Radiology, P.C. ("PHR").  *See Liberty Mut. Ins. Co. v. Bakst*, No. 1:13-cv-04186-WFK-RML (E.D.N.Y.); *Nationwide Affinity*

*Ins. Co. of Am. v. Professional Health Imaging, P.C.*, Index No. 600407/2016 (N.Y. Sup. Ct., Nassau Cnty.); *Liberty Mut. Ins. Co. v. Community Medical Imaging, P.C.*, Index No. 653508/2015 (N.Y. Sup. Ct., New York Cnty.); *21st Century Ins. Co. v. Professional Health Imaging, P.C.*, Index No. 156583/2015 (N.Y. Sup. Ct., New York Cnty.); *GEICO v. Bakst*, No. 15-cv-00537-ARR-JO (E.D.N.Y.).

41.    Vaynshteyn owns Global Stone, which is a company that facilitated Vaynshteyn's control over CMIBK.

42.    Vaynshteyn participated in the operation and management of CMI and CMIBK during the relevant period, and is therefore responsible for the fraudulent and non-compensable medical services billed in connection with the claimants at issue in this Complaint.

**3.    Community Medical Imaging, P.C. ("CMI")**

43.    CMI is organized as a professional service corporation under New York law.

44.    CMI's principal place of business is located at 159-16 Union Tpke, Fresh Meadows, New York.

45.    CMI is an enterprise whose activities affect interstate commerce.

46.    McDonnell and Vaynshteyn participated in the operation and management of the CMI enterprise during the relevant period.

47.    CMI was registered under McDonnell's name and medical license, but CMI actually was operated and controlled by Vaynshteyn throughout the course of this scheme, which is against New York law.

48.    CMI billed for diagnostic radiology services in connection with Allstate claimants.

49.     CMI's bills are fraudulent because the medical services were unnecessary and were provided under a predetermined treatment protocol designed to rush patients into as much treatment as soon as possible.

50.     CMI's bills are also fraudulent because they misrepresent and omit material facts about the ownership of CMI—the NF-3 bills submitted to Allstate falsely represent McDonnell as CMI's only owner.

51.     CMI violated several applicable New York licensing requirements by (a) splitting professional fees with unlicensed persons, (b) billing for fraudulent or unnecessary medical services, and (c) treating patients with predetermined protocols.

52.     CMI also violated applicable New York laws and regulations that prohibit the ownership of PCs by unlicensed persons.

53.     Accordingly, CMI was never eligible to collect No-Fault payments from Allstate under N.Y. Ins. Law § 5102.

**4.     Community Medical Imaging of Brooklyn, P.C. ("CMIBK")**

54.     CMIBK is organized as a professional service corporation under New York law.

55.     CMIBK's principal place of business is located at 2102 Avenue Z, Brooklyn, New York.

56.     CMIBK is an enterprise whose activities affect interstate commerce.

57.     McDonnell, Vaynshteyn, and Global Stone participated in the operation and management of the CMIBK enterprise during the relevant period.

58.     CMIBK was registered under McDonnell's name and medical license, but CMIBK actually was operated and controlled by Vaynshteyn and Global Stone throughout the course of this scheme.

9

59.     CMIBK billed for diagnostic radiology services in connection with Allstate claimants.

60.     CMIBK's bills are fraudulent because the medical services were unnecessary and were provided under a predetermined treatment protocol designed to rush patients into as much treatment as soon as possible.

61.     CMIBK's bills are also fraudulent because they misrepresent and omit material facts about the ownership of CMIBK—the NF-3 bills submitted to Allstate falsely represent McDonnell as CMIBK's only owner.

62.     CMIBK violated several applicable New York licensing requirements by (a) splitting professional fees with unlicensed persons, (b) billing for fraudulent or unnecessary medical services, and (c) treating patients with predetermined protocols.

63.     CMIBK also violated applicable New York laws and regulations that prohibit the ownership of PCs by unlicensed persons.

64.     Accordingly, CMIBK was never eligible to collect No-Fault payments from Allstate under N.Y. Ins. Law § 5102.

**5.     Global Stone Associates, Inc.**

65.     Global Stone is a business corporation organized under New York law.

66.     Global Stone's principal place of business is located at 5422 16th Avenue, 1st Floor, Brooklyn, New York.

67.     Vaynshteyn owns Global Stone.

68.     Vaynshteyn used Global Stone to obtain control over CMIBK and its professional fees, which is illegal because medical providers are prohibited from sharing professional fees with unlicensed persons.

69.     Global Stone participated in the operation and management of the CMIBK enterprise during the relevant period, and is therefore responsible for the fraudulent and non-compensable medical services billed in connection with the claimants at issue in this Complaint.

## III.   **JURISDICTION AND VENUE**

70.     Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. §§ 1331 and 1332.

71.     Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

72.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the vast majority of the acts known to Allstate alleged herein were carried out within the Eastern District of New York.

73.     At all relevant times, the Defendants have engaged in purposeful activities in New York by seeking and submitting payment demands for claims made under New York's No-Fault laws, as detailed, *infra*.

74.     The Defendants' activities in and contacts with New York were purposefully sought and transacted to take advantage of the benefits available under New York's No-Fault laws.

75.     As the allegations and causes of action in the within Complaint arise from (a) the Defendants' unlawful acts committed in the State of New York, and (b) the fraudulent and non-compensable billing that the Defendants generated and submitted from within the State of New York seeking payment under New York's No-Fault laws, there is no question that there exists a substantial relationship or connection between the State of New York, the transactions at issue, and Allstate's causes of action.

IV.     **APPLICABLE NO-FAULT LAWS AND LICENSING STATUTES**

A.      **GENERAL OVERVIEW OF NEW YORK'S NO-FAULT LAWS**

76.     Allstate underwrites automobile insurance in the State of New York.

77.     New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay reasonable fees for necessary healthcare services.

78.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law § 5101, *et seq*.), and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. § 65, *et seq*.) (collectively, "the No-Fault laws"), automobile insurers are required to provide Personal Injury Protection Benefits (hereinafter, "No-Fault benefits") to Allstate claimants.

79.     Under the New York No-Fault laws, individuals are entitled to be compensated for "basic economic loss" resulting from injuries caused by the operation of a motor vehicle.

80.     "Basic economic loss" is defined to include "all necessary expenses" for medical services.  N.Y. Ins. Law § 5102(a)(1); 11 N.Y.C.R.R. § 65-1.1.

81.     No-Fault benefits include at least $50,000.00 per eligible person for reasonable expenses that are incurred for necessary medical services.

B.      **ELIGIBILITY REQUIREMENTS UNDER NEW YORK'S NO-FAULT LAWS**

82.     Medical providers are not eligible to collect payment under New York's No-Fault laws if they fail to meet any applicable New York State or local licensing requirements necessary to perform those services in New York.  *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

83.     An insurer may withhold No-Fault payments to a medical provider when there is a willful and material failure by the provider to abide by licensing and incorporation statutes.  *State*

*Farm Mut. Auto. Ins. Co. v. Mallela*, 827 N.E.2d 758 (N.Y. 2005); 11 N.Y.C.R.R. § 65-3.16(a)(12).

84.   Parties may "look beyond the face of licensing documents" to demonstrate illegal ownership and control. *Mallela*, 827 N.E.2d at 761. Numerous factors may be considered when determining actual control of a medical provider, such as one-sided agreements, control of assets, profit sharing, and the extent of the nominal owner's role in the entity's business. *See Andrew Carothers, M.D., P.C. v. Progressive Ins. Co.*, 79 N.Y.S.2d 439, 443-444 (App. Term, 2nd Dept. 2013).

85.   If shown, a provider's illegal corporate practice "may support a finding that the provider is not an eligible recipient of reimbursement under 11 N.Y.C.R.R. § 65-3.16(a)(12) without meeting the traditional elements of common-law fraud." *Andrew Carothers, M.D., P.C. v. Progressive Ins. Co.*, 128 N.E.3d 153, 163 (N.Y. 2019).

### 1.   Unlawful Control of PCs

86.   Fraudulently incorporated medical providers are not entitled to collect No-Fault payments, and a provider commits fraud by submitting No-Fault claims when it is owned or controlled by non-physicians. *Allstate Ins. Co. v. Lyons*, 843 F. Supp. 2d 358, 371 (E.D.N.Y. 2012).

87.   The fraudulent incorporation of medical providers is forbidden in New York because it compromises patient care and brings other types of fraud such as billing for medically unnecessary services and billing at inflated rates. *See State Farm Mut. Auto. Ins. Co. v. Mallela*, 372 F.3d 500, 503-504, 507 (2d Cir. 2004).

88.     The term "fraudulently incorporated" has been interpreted to mean any "corporate practice that shows 'willful and material failure' to abide by licensing and incorporation statutes." *See Carothers*, 128 N.E.3d at 163 (quoting *Mallela*, 827 N.E.2d at 761).

89.     New York Business Corporation Law § 1507 prohibits a professional service corporation from issuing shares to individuals unless they are "engaged in the practice of such profession in such a corporation."  It also prohibits such shareholder(s) from entering into any agreement, granting proxies, or transferring control to individuals who are not authorized by law to practice the profession for which the professional corporation is authorized to practice.

90.     Pursuant to New York Business Corporation Law § 1508, no individual may be a director or officer of a professional service corporation unless he is authorized by law to practice in this state a profession that such corporation is authorized to practice.

91.     Under New York Education Law § 6530(19), it is professional misconduct for a licensed physician to permit any person to share in the fees for professional services, other than a partner, employee, associate of a professional firm or corporation, professional subcontractor or consultant authorized to practice medicine, or a legally authorized trainee practicing under the supervision of a licensee.

92.     Under New York Education Law § 6530, it is also professional misconduct for a licensed physician to (a) practice the profession fraudulently, (b) order excessive tests or treatment not warranted by the condition of the patient, and (c) fail to maintain a record for each patient that accurately reflects the evaluation and treatment of the patient.

### 3.     Unlawful Referral Arrangements

93.     New York law prohibits unprofessional conduct in the practice of medicine, nursing, and chiropractic, which includes exploiting patients for financial gain.  8 N.Y.C.R.R. §

29.1(b)(2) (prohibiting medical, nursing, and chiropractic professionals from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party").

94.     New York law prohibits physicians and physician assistants from "[d]irectly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or in connection with the performance of professional services."  *See* N.Y. Educ. Law § 6530(18); *see also* 8 N.Y.C.R.R. § 29.1(b)(3) (prohibiting physicians, physician assistants, nurse practitioners, and chiropractors from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services.").

95.     Likewise, under New York Public Health Law § 238-a, a practitioner authorized to order x-ray or imaging services may not make a referral for such services to a healthcare provider authorized to provide such services where such practitioner has a financial relationship with such healthcare provider.  A financial relationship includes a compensation agreement and includes an arrangement with a healthcare provider that is in excess of fair market value or that provides compensation that varies directly or indirectly based on the volume or value of any referrals or business between the parties.  N.Y. Pub. Health Law § 238-a(1), (5).

C.    CLAIMING REIMBURSEMENT UNDER NEW YORK'S NO-FAULT LAWS

96.     Claimants can assign their No-Fault benefits to healthcare providers.

97.     Under a duly executed assignment, a claimant's medical provider may submit claims directly to an insurance company and receive payment for necessary medical services rendered.

98.     Medical providers can submit claims for No-Fault benefit payments by using the claim form required by the DOI (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3 form").

99.     NF-3 forms are important because they certify that the provider's request for payment is not materially false, misleading, or fraudulent.  11 N.Y.C.R.R. § 65.3-11(a); N.Y. Ins. Law § 403(d).

100.    Under New York law, medical providers must verify their NF-3 submissions subject to the following warning:

> "Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime."

N.Y. Ins. Law § 403(d).

101.    A medical provider makes a material misrepresentation when it submits an NF-3 form that either omits or misrepresents material information about the provider's eligibility to seek or collect payment under New York's No-Fault laws.

102.    A medical provider's omission or misrepresentation of material facts can take many forms, including false and misleading information about (a) the ownership of a PC seeking payment, (b) the necessity of the service, and (c) compliance with the requirements of the applicable fee schedule.

103.    A medical provider's representations about PC ownership and control are material because New York law requires that all professional medical service corporations be owned and controlled by appropriately licensed medical professionals.  *See* N.Y. Bus. Corp. Law §§ 1503, 1507.

104.    A medical provider's misrepresentations of the necessity of the service are material because, under New York law, a medical provider, including a radiology facility performing MRIs, is only eligible to bill for and collect charges from an insurer for healthcare services pursuant to N.Y. Ins. Law § 5102(a) if the billed-for services are necessary.  *See* N.Y. Ins. Law § 5102(a)(1); 11 N.Y.C.R.R. § 65-1.1; *Long Island Radiology v. Allstate Ins. Co.*, 830 N.Y.S.2d 192, 194 (App. Div. 2nd Dept. 2007) ("Since the defense of lack of medical necessity may indisputably be raised by the defendants against the injured party, it is available as against radiologists who accept assignments of no-fault benefits." (internal citations omitted)).

105.    Finally, a medical provider's misrepresentations regarding compliance with the applicable fee schedule are material because the New York Workers' Compensation Board has established a schedule of fees known commonly as the "Workers' Compensation Fee Schedule" ("Fee Schedule").

106.    The Fee Schedule is used by healthcare providers and insurers to determine the level of reimbursement payable on legitimate claims.

107.    Under New York's No-Fault laws, healthcare providers are prohibited from submitting charges that exceed the amounts set forth in the Fee Schedule.

108.    Additionally, New York's No-Fault laws expressly provide that "[a] provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet **any** applicable New York State or local licensing requirement

necessary to perform such service in New York." *See* 11 N.Y.C.R.R. § 65-3.16(a)(12) (emphasis added).

109.   Accordingly, if a medical provider fails to meet any applicable licensing requirement necessary to perform a service, then the provider is not lawfully entitled to seek or collect payments under New York's No-Fault laws.

110.   As alleged herein, the Defendants failed to meet several applicable New York licensing laws and regulations when operating the PC Defendants and billing for medical services during the course of this scheme; therefore, CMI and CMIBK were never eligible to seek or collect No-Fault payments from Allstate.

## V.   FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

111.   New York's No-Fault system provides eligible claimants with compensation for necessary medical services.

112.   Prompt payment of No-Fault claims is required following the submission of facially valid bills.

113.   New York's No-Fault laws and enacting regulations are clear that providers are not eligible for payment under Insurance Law § 5102 if they fail to meet any New York State or local licensing requirement necessary to perform such service in New York.

114.   The PC Defendants were operated in violation of applicable New York licensing requirements because they (a) split professional fees with one or more unlicensed persons, (b) billed for unnecessary diagnostic imaging services, (c) took part in unlawful referral arrangements, (d) charged excessive rates for unnecessary services, and (e) were controlled by one or more unlicensed persons.

115.    The Defendants' scheme revolved around billing for as many MRIs as possible. The MRIs were not medically necessary because they were ordered under predetermined treatment protocols.  The MRI orders were also the product of prohibited patient referrals in some cases.

116.    The Defendants' actions jeopardized patient health and safety because the MRI results were often utilized by the claimants' other medical providers, which caused additional billing for unnecessary services such as surgeries and pain management injections.

A.    UNLAWFUL CONTROL OF PC DEFENDANTS

1.    CMI

117.    Vaynshteyn has a history of involvement in No-Fault fraud schemes.  Vaynshteyn managed and controlled CMI's predecessor, non-party Professional Health Radiology, P.C. ("PHR"), which was operated from a facility located at 98-28 Queens Boulevard, Rego Park, NY ("Rego Park Facility").  *See Liberty Mut. Ins. Co. v. Bakst*, No. 1:13-cv-04186-WFK-RML (E.D.N.Y.).

118.    PHR was owned on paper by non-party Stewart Bakst, M.D. ("Bakst"), an absentee physician who lived in Florida, but control over PHR's operation and finances resided with Vaynshteyn. *Id.*

119.    PHR was closed and its assets were sold to McDonnell, who had worked for another imaging provider—non-party Professional Health Imaging, P.C. ("PHI"), which was also controlled by unlicensed persons, including Vaynshteyn.

120.    McDonnell's purchase of PHR's assets was orchestrated by Vaynshteyn—not the actual owner of the PC.

121.    McDonnell purchased PHR's assets without conducting any meaningful due diligence beyond reviewing financial records furnished by Vaynshteyn.

19

122.    McDonnell never obtained a fair market valuation opinion, nor did he investigate PHR's litigation history, particularly the accusations that PHR was illegally controlled by unlicensed persons, including Vaynshteyn:

```
 6       Q.    Did you or anybody on your
 7    behalf look into whether PHR had been a
 8    party in a lawsuit?
 9       A.    No.
10       Q.    Did you ever ask Stewart Bakst
11    about that?
12       A.    No, I did not.
13       Q.    How about Gregory Vaynshteyn?
14       A.    I can't recall.
```

123.    Indeed, McDonnell and Vaynshteyn avoided discussions about PHR's litigation history or Vaynshteyn's control over the assets being purchased from PHR's prior nominal physician-owner:

```
2              A.    Yes.  He did ask me briefly was anything

3     wrong with the Professional Health Radiology.  I told

4     him we do have a lawsuit once with Liberty and that's

5     it.

6              Q.    And he didn't have any concerns as far as

7     you know about purchasing from Dr. Bakst at that point

8     after you had those conversations?

9              A.    I don't know.

10             Q.    Did he ask you if you were the real owner

11    of Professional Health Radiology?

12             A.    No.

13             Q.    Did you ever show him the lawsuit, the

14    papers itself?

15             A.    No.
```

124.    PHR and CMI entered into an asset sale agreement after Vaynshteyn recruited McDonnell to join the scheme and form CMI.  The asset sale agreement was a sham for several reasons.

125.    First, according to the terms of the Agreement of Sale, CMI purchased PHR's assets, including diagnostic imaging equipment (e.g., MRI machine, CT scanner, x-ray machine), for a total purchase price of $90,000, which was significantly below the market value of the equipment.

126.    Second, the assets were initially purchased by Vaynshteyn for PHR's use at the Rego Park Facility.  Vaynshteyn purchased the equipment for around $240,000.00, and then sold the equipment to PHR for $360,000.00.  Only months after completing repayments to Vaynshteyn, PHR was forced to sell the same assets to CMI for a total of only $90,000.00, which represented a mere fraction of PHR's actual cost to acquire the equipment.

127.    Third, CMI never actually paid the $90,000.00 to PHR.  CMI was supposedly unable to pay PHR due to "cash flow" problems, the details of which were communicated to PHR by Vaynshteyn, not McDonnell.  Despite CMI's supposed inability to pay, the parties never renegotiated the terms of sale and PHR never took action to enforce CMI's breach, all of which highlights the sham nature of the agreement.

128.    Fourth, CMI actually began operating from the Rego Park Facility nearly 2 months before the CMI-PHR asset sale was even completed, which demonstrates that the sale was not an arm's length transaction.

129.    Fifth, CMI was operated and controlled in the same manner as its predecessor PHR following the asset sale.  Vaynshteyn became the manager of CMI without a formal hiring process—Vaynshteyn was hired to manage CMI based on his own self-reported experience in operating imaging centers, which he gained by controlling PHR in violation of New York law.  *See GEICO v. Bakst*, No. 15-cv-00537-ARR-JO (E.D.N.Y.) (alleging that Baskt admitted to a GEICO investigator that Vaynshteyn controlled the day-to-day operations of PHI and PHR).

130.    CMI also retained all of PHR's employees, and even continued using the same phone number:

COMMUNITY MEDICAL IMAGING PC
98-28 QUEENS BLVD   REGO PARK, NY 11374-4257
718-275-1010

PROFESSIONAL HEALTH RADIOLOGY PC
98 28 QUEENS BLVD    STE 6
REGO PARK, NY 11374-4257   718 275-1010

131.    CMI also hired outside service providers linked to Vaynshteyn.   CMI's bookkeeping was handled by Vaynshetyn's personal accountant, and CMI's billing was handled by Vaynshteyn's sister.

132.    Vaynshteyn controlled the "nuts and bolts of daily operation" for CMI, according to McDonnell.   Vaynshteyn controlled personnel matters, negotiated leases, managed multiple locations, and even prepared McDonnell to testify at examinations under oath conducted by insurance companies.

133.    Vaynshteyn managed CMI's move from the Rego Park Facility to a new facility located at 159-16 Union Turnpike, Fresh Meadows, New York ("Fresh Meadows Facility"). Vaynshteyn's control of CMI continued at the Fresh Meadows Facility.

134.    Vaynshteyn also managed CMI's expansion to a second facility, which was located at 234-28 Merrick Blvd, Rosedale, New York ("Rosedale Facility").   CMI expanded to the Rosedale Facility in or around March 2018.  Vaynshteyn negotiated the terms of CMI's lease for the Rosedale Facility; he even represented himself to the NYC Department of Buildings as the "owner/manager of the property at 234-28 Merrick Boulevard":

Date : 12/13/17

Borough : QUEENS

Block : 13198

Lot : 38

Job # : 440427637

Address : 234-28 MERRICK BOULEVARD, QUEENS, NY 11422

To whom this may concern,

I, Gregory Vaynshteyn, owner/manager of the property at 234-28 Merrick Boulevard, Queens,

DEPT BLDGS Job No. 440427637

Scan Code   ESHS0400138

135.    Vaynshteyn also managed CMI's operations at the Rosedale Facility until CMI ceased operating from this location in or about April 2021.

136.    Vaynshteyn maintained total control over CMI.  McDonnell did not—he was busy working elsewhere during the relevant period.

137.    McDonnell is employed as a Medical Officer with the VHA, and is one of the VHA's highest-paid employees.

138.     McDonnell reportedly works full time at the VHA's hospital in Bath, NY, which is located over 300 miles away from CMI and CMIBK's imaging facilities.

139.    McDonnell claims that he worked at the VHA hospital 3 to 5 days per week throughout this scheme, with hours typically spanning from 8:30 a.m. to 2:30 p.m.

140.    McDonnell also worked for another imaging provider during the same period, for which he interpreted approximately 40 films per day.

141.    McDonnell was rarely at CMI's imaging facilities.  McDonnell visited CMI's Rego Park Facility about once per month.  McDonnell was similarly absent from CMI's Fresh Meadows and Rosedale facilities.

142.    Despite a limited presence, McDonnell was CMI's only treating provider during the relevant period, according to the bills mailed to Allstate in support of CMI's No-Fault claims.

## 2. CMIBK

143.    CMIBK was incorporated on or about May 18, 2021.

144.    According to McDonnell, it was Vaynshteyn's idea to create CMIBK.

145.    In or about October 2020, Vaynshteyn asked McDonnell about opening another imaging facility at 2102 Avenue Z, Brooklyn, New York ("Brooklyn Facility").  According to McDonnell, Vaynshteyn "wanted to build his own business" and "wanted to have a facility that was his and grow his own business."

146.    Vaynshteyn owned an entity named Global Stone, which became CMIBK's landlord at the Brooklyn Facility.

147.    Vaynshteyn developed CMIBK using the same methods as he did with CMI's predecessor—Vaynshteyn offered to build the facility and buy the equipment; he also used the same construction company in both projects.

148.    CMIBK and Global Stone entered into an agreement characterized as a "medical diagnostic imaging facility, equipment and maintenance agreement," which, in reality, was a one-

sided agreement that was designed such that Vaynshteyn could exert control over CMIBK through Global Stone, and gain ownership of the professional fees paid to CMIBK.

149.    CMIBK was obligated to pay Global Stone (i.e., Vaynshteyn) $50,000 per month (or $600,000 per year) for imaging facility space, medical imaging equipment, and medical imaging equipment maintenance services.

150.    The parties obtained an opinion on the fair market value of the CMIBK-Global Stone agreement, but only to create the illusion of an arm's-length relationship between the parties.

151.    The resulting opinion was a sham because Vaynshteyn and Global Stone were the only sources of information used in the opinion, which concluded that the fair market value of the proposed agreement between CMIBK and Global Stone "as of June 30, 2021, ranged $42,000 - $57,000 a month," which encompassed the proposed agreement's fee of $50,000 per month.

152.    The opinion calculated fair market value by adding (a) the monthly value of the tangible assets (e.g., real property, equipment, etc.), and (b) the monthly value of intangible assets, which were characterized as the economic benefit of CMIBK not having to acquire and construct a fully-functioning imaging facility.

153.    The intangible asset value was the product of CMIBK's estimated anticipated monthly net income multiplied by the number of months saved by using Vaynshteyn/Global Stone's turn-key facility.

154.    CMIBK's estimated anticipated monthly net income was calculated using estimated expenses for staff salaries, taxes, and advertising—all of which was supplied by Vaynshteyn and Global Stone.

155.    The time savings was determined by calculating the time needed to plan, construct, install, and market a similar facility.   The opinion determined that CMIBK's use of the

Vaynshteyn/Global Stone's turn-key facility resulted in a time savings of 7.08-9.88 months, which was calculated using only the data and assumptions provided by Vaynshteyn.

156.     It was in Vaynshteyn's interest to have the highest market value possible, yet Vaynshteyn's materials, values, and expectations were the only sources considered in forming the opinion.

157.     By August 2021 (the date of the opinion), CMIBK had already lost months of potential income by waiting for Vaynshteyn and Global Stone to develop and build the Brooklyn Facility instead of finding an actual turn-key facility in October 2020.

158.     In reality, there was no time savings to CMIBK—the parties began discussing the project in October 2020, which was 9 months before the opinion was rendered.

159.     The marketing value was also grossly overstated.    Vaynshteyn supplied expectations that the marketing savings would equal 1.5-2 months, and the opinion found a time value of 2-2.5 months for "marketing ramp up time."  These figures are bogus because McDonnell testified that the appeal of the Brooklyn Facility was its existing referral base, which meant that CMIBK did not need advertising or marketing services to obtain patients.

160.     Therefore, the turn-key intangible asset calculation was a crucial component of the fair market value analysis and Vaynshteyn had an interest in ensuring that this amount was as high as possible.

161.     McDonnell could not explain the basis for the expenses used to estimate CMIBK's anticipated monthly revenues; instead, he deferred to Global Stone/Vaynshteyn or CMIBK's attorney:

```
14        Q.    Do you know what documents they
15   reviewed to come up with those amounts for
16   the estimated advertising costs?
17        A.    All of the valuations were based
18   on what Global forwarded to them and what
19   Raymond forwarded.
```

162.    Even if the opinion was based on credible data and assumptions, the entire process was still a charade because CMIBK began operating from the 2102 Avenue Z, Brooklyn, NY location before having the fair market valuation, or even a lease to use the space—it was a foregone conclusion that CMIBK would operate from the Brooklyn Facility.

163.    For example, CMIBK billed claimant L.A. (claim no. 0634243802) for services on August 3, 2021, which was before CMIBK entered into the facility lease with Global Stone:

| 15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | |
|---|---|---|---|---|
| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
| 08/03/21 | CMIBK   11235 | MRI WRIST/SHOULDER/ELBOW | 73221LT | 966.54 |
| | | | TOTAL CHARGES TO DATE$ | 966.54 |

164.    McDonnell was not regularly present at CMIBK's Brooklyn location even though McDonnell was the PC's sole radiologist, according to CMIBK's No-Fault bills.

165.    McDonnell admitted that CMIBK was managed by unlicensed persons in his absence, which was most of the time given McDonnell's VHA duties and other positions.

166.    CMIBK was actually managed and controlled by Vaynshteyn, not McDonnell.

167.    According to McDonnell, Vaynshteyn's "main job" was manager of CMI.

168.    CMI and CMIBK share services and are linked.

169.    CMIBK's bills are prepared by CMI employees at CMI's Fresh Meadows Facility who are under Vaynshteyn's supervision as manager of CMI.

170.    CMI and CMIBK share an email address for billing purposes, and also share the same website (www.cmimr.com).  Visitors are led to believe that "Community Medical Imaging" is one facility with 2 locations in Brooklyn and Queens:



171.    The shared website also represents "Community Medical Imaging" as being accredited by the American College of Radiology:



172.     This false.  CMIBK was not accredited by the ACR, according to McDonnell.

173.     Nonetheless, CMIBK's ACR accreditation was falsely touted on CMIBK's order forms and narrative reports, including those for claimant L.A. (claim no. 0634243802):



174.     CMIBK's bills contained other false information, including representations that CMIBK was owned by non-party Bakst:

| 15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | |
|---|---|---|---|---|
| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
| 01/21/22 01/21/22 | CMIBK  11235 CMIBK  11235 | MRI WRIST/SHOULDER/ELBOW MRI WRIST/SHOULDER/ELBOW | 73221LT 73221RT | 966.54 724.91 |
| | | | TOTAL CHARGES TO DATES | 1691.45 |

| 16. IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING: | | | | | |
|---|---|---|---|---|---|
| TREATING PROVIDER'S NAME | TITLE | LICENSE OR CERTIFICATION NO. | BUSINESS RELATIONSHIP CHECK APPLICABLE BOX | | |
| | | | EMPLOYEE | INDEPENDENT CONTRACTOR | OTHER (SPECIFY) |
| MCDONNELL, ANDREW MD | MD | 170764 | | x | |

17. IF THE PROVIDER OF SERVICE IS A PROFESSIONAL SERVICE CORPORATION OR DOING BUSINESS UNDER AN ASSUMED NAME (DBA), LIST THE OWNER AND PROFESSIONAL LICENSING CREDENTIALS OF ALL OWNERS (Provide an additional attachment if necessary).

BAKST, STEWART RADIOLOGIST 200451

175. This was false because Bakst died in 2017 and was never the owner of CMIBK.

176. This was not an isolated error; Bakst was identified as CMIBK's owner in numerous NF-3 forms submitted to Allstate by CMIBK as illustrated by the representative examples below:

| Claimant | Date(s) of Service | PC Defendant | Owner – Box 17 |
|---|---|---|---|
| A.C. (claim no. 0660961723) | 3/7/2022; 3/15/2022; 3/23/2022; 3/31/2022 | CMIBK | Bakst |
| D.D. (claim no. 0634243802) | 8/31/2021 | CMIBK | Bakst |
| D.T. (claim no. 0645954990) | 10/18/2021 | CMIBK | Bakst |
| D.I. (claim no. 0654387406) | 3/15/2022 | CMIBK | Bakst |
| I.H. (claim no. 0643021009) | 10/18/2021 | CMIBK | Bakst |
| L.G. (claim no. 0661863779) | 5/4/2022 | CMIBK | Bakst |
| L.A. (claim no. 0634243802) | 8/31/2021; 8/3/2021 | CMIBK | Bakst |

| Claimant | Date(s) of Service | PC Defendant | Owner – Box 17 |
|---|---|---|---|
| M.M. (claim no. 0512444803) | 12/3/2021 | CMIBK | Bakst |
| M.F. (claim no. 0662192467) | 3/21/2022 | CMIBK | Bakst |
| M.C. (claim no. 0653812784) | 12/20/2021 | CMIBK | Bakst |
| M.A. (claim no. 0649371093) | 11/18/2021 | CMIBK | Bakst |
| M.A. (claim no. 0662192467) | 3/18/2022; 3/29/2022 | CMIBK | Bakst |
| P.G. (claim no. 0635965510) | 8/6/2021; 8/16/2021 | CMIBK | Bakst |
| R.N. (claim no. 066219242467) | 5/16/2022 | CMIBK | Bakst |
| R.R. (claim no. 0657895776) | 1/28/2022 | CMIBK | Bakst |
| Y.F. (claim no. 0664059417) | 4/14/2022; 4/25/2022; 5/4/2022 | CMIBK | Bakst |
| Z.N. (claim no. 0662192467) | 3/21/2022 | CMIBK | Bakst |

177.    However, the posthumous use of Bakst's name and license credentials was not a coincidence; it demonstrates Vaynshteyn's links to CMIBK—Bakst was the nominal owner of CMI's predecessor (PHR), which had also been controlled by Vaynshteyn.

B.    UNLAWFUL REFERRAL ARRANGEMENTS WITH PRESCRIBING PROVIDERS

178.    The success of the Defendants' scheme depended on a steady stream of referrals for diagnostic imaging to CMI and CMIBK.

179.    The Defendants needed patients that could be billed for MRIs, and also needed providers to order MRIs and then steer the patients to CMI and CMIBK.

180.    The Defendants maintained collusive relationships with other providers for the referral of patients for imaging services in violation of New York law prohibiting such arrangements.

181.    Vaynshteyn marketed CMI's services to potential referral sources, which involved hosting luncheons for doctors and distributing promotional materials to doctor's offices.

182.    According to McDonnell, Vaynshteyn was "confident in the area and the market" in the Sheepshead Bay neighborhood of Brooklyn, which led to the opening of CMIBK.

183.    Vaynshteyn's confidence stemmed from the fact that his family members controlled a clinic located less than 5 miles away from CMIBK's facility.

184.    Specifically, upon information and belief, non-parties Albert Vaynshteyn ("Albert," Vaynshteyn's brother), and Yelena Maksumov a/k/a Yelena Vaynshteyn ("Yelena," Vaynshteyn's sister-in-law) controlled the clinic located at 410 Ditmas Ave, Brooklyn, NY, which is a facility with a record of involvement in an alleged No-Fault fraud scheme. *See Allstate Ins. Co. v. Salehin*, No. 21-cv-00420-LDH-VMS (E.D.N.Y.) (alleging that Albert and Yelena participated in the unlawful operation and management of the providers and PCs operating from the 410 Ditmas Ave clinic and caused these providers to refer patients to an imaging facility also controlled by them for medically unnecessary imaging services).

185.    Vaynshteyn's relatives have been accused of funneling patients to diagnostic imaging facilities that they unlawfully operated and controlled pursuant to unlawful referral relationships with physicians. *See GEICO v. Eclipse Medical Imaging, P.C.*, No. 21-cv-01074-BMC (E.D.N.Y.) (alleging that Albert and Yelena required the radiology practices controlled by them to use their referral sources, including providers with a "significant history of insurance fraud").

186.    Patients of the 410 Ditmas Avenue clinic were referred to CMI and CMIBK by a host of providers, including non-party Sayeedus Salehin, M.D. ("Salehin").

187.    Claimants H.R. (claim no. 0538421405) and L.A. (claim no. 0539683747) were referred to CMI from the 410 Ditmas Avenue clinic through an order form bearing a stamp of Salehin's signature:





188.    According to McDonnell, CMIBK did not need to advertise or market its services because the PC was already "known."

189.    As noted above, CMIBK started billing for services from the Brooklyn Facility before the PC had even signed a lease for this location.

190.    Indeed, patients were steered to CMIBK for MRIs prior to September 1, 2021 by providers working at the 410 Ditmas Ave clinic, including Salehin and his assistant (non-party Enisa Dukanovic, PA):

| Claimant | Date of Service | Referring Provider |
|---|---|---|
| L.A. (claim no. 0634243802) | 8/3/2021 | Sayeedus S. Salehin, M.D. |
| P.G. (claim no. 0635965510) | 8/6/2021 | Enisa Dukanovic, PA |
| P.G. (claim no. 0635965510) | 8/16/2021 | Enisa Dukanovic, PA |
| D.D. (claim no. 0634243802) | 8/31/2021 | Sayeedus S. Salehin, M.D. |
| L.A. (claim no. 0634243802) | 8/31/2021 | Sayeedus S. Salehin, M.D. |

191.    CMI's and CMIBK's other referring providers are also linked to schemes involving unlawful patient referral arrangements:

| Prescriber | PC Defendant | Prior Healthcare/No-Fault Fraud Actions |
|---|---|---|
| Alexios Apazidis, M.D. | CMIBK | • *Allstate Ins. Co. v. Excell Clinical Lab, Inc.*, No. 22-cv-00334-ARR-ST (E.D.N.Y.)<br>  o Apazidis conspired with owner of laboratory for improper referrals for unnecessary urine drug testing, per complaint.<br>• *Allstate Ins. Co. v. Melgar*, No. 22-cv-07634-AMD-SIL (E.D.N.Y.)<br>  o Apazidis ceded control of a PC to non-physicians and conspired with the non-physicians to bill for medically unnecessary treatment and testing, per complaint. |
| Alford Smith, M.D. | CMI | • *Allstate Ins. Co. v. Rybak*, No. 22-cv-04441-SJB (E.D.N.Y.)<br>  o Smith ceded control over PCs to non-physicians and billed Allstate for medically unnecessary treatments and tests, per complaint.<br>• *GEICO v. Cean*, No. 19-cv-02363-PKC-RLM (E.D.N.Y.)<br>  o Smith provided medically unnecessary examinations and referred patients for |

| Prescriber | PC Defendant | Prior Healthcare/No-Fault Fraud Actions |
|---|---|---|
| | | medically unnecessary urine drug screens and compounded pain creams, per complaint. <br> • *GEICO v. Smith*, No. 19-cv-04882-DLI-RML (E.D.N.Y.) <br>    o Smith ceded control over a PC to non-physicians, billed for medically unnecessary tests and services, and engaged in unlawful kickback arrangements in exchange for the referral of patients, per complaint. |
| Ana Romeo, M.D. | CMI | • *GEICO v. Healthy Age Medical, P.C.*, No. 19-cv-02398-AMD-VMS (E.D.N.Y.) <br>    o Romeo ceded control of a PC to laypersons who controlled the clinic at 764 Elmont Road in Elmont, NY; patients were obtained through unlawful payments for referrals and subjected to a predetermined treatment protocol, per complaint. |
| Ashraf Salem, M.D. | CMIBK | • *GEICO v. American Kinetics Labs, Inc.*, No. 19-cv-02947-ENV-JRC (E.D.N.Y.) <br>    o Salem generated fraudulent prescriptions for unnecessary DME and orthotic devices at the direction of layperson clinic controllers who entered into unlawful kickback arrangements with a DME company, per complaint. |
| Azu Ajudua, M.D. | CMI | • *GEICO v. Jacobson*, No. 15-cv-07236-ERK-RML (E.D.N.Y.) <br>    o Ajudua unlawfully referred patients to other healthcare providers for medically unnecessary services in exchange for kickback payments disguised as rent, per complaint. <br> • *GEICO v. Ajudua*, No. 15-cv-05199-MKB-RLM (E.D.N.Y.) |

| Prescriber | PC Defendant | Prior Healthcare/No-Fault Fraud Actions |
|---|---|---|
| | | ○ Ajudua ceded control of PC to non-physicians and unlawfully split fees the PC's fees for medically unnecessary medical treatments and services with these non-physicians, per complaint.<br><br>• *GEICO v. 21st Century Pharmacy, Inc.*, No. 16-cv-04826-ERK-JO (E.D.N.Y.)<br>  ○ Ajudua referred prescriptions for medically unnecessary and fraudulent compounded pain creams to a pharmacy in exchange for kickback payments, per amended complaint.<br><br>• *GEICO v. Starrett City Medical, P.C.*, No. 21-cv-00059-NGG-RML (E.D.N.Y.)<br>  ○ Ajudua ceded control of PCs to non-physicians and split the PCs' fees for medically unnecessary treatments and services with these non-physicians in violation of New York law, per complaint.<br><br>• *Allstate Ins. Co. v. Hollis Novel Comprehensive Medical, P.C.*, No. 20-cv-06108-ENV-RER (E.D.N.Y.)<br>  ○ Ajudua participated in an unlawful No-Fault fraud scheme by ceding control of PCs to non-physicians, providing medically unnecessary treatments and services, and referring prescriptions for medically unnecessary drugs and medications to pharmacies owned and controlled by one or more of the PCs' layowners, per complaint. |
| Bhupinder Sawhney, M.D. | CMI | • *Liberty Mut. Ins. Co. v. Nexray Medical Imaging, P.C.*, No. 12-cv-05666-NGG-VMS (E.D.N.Y.)<br>  ○ Sawhney, who is not a radiologist, ceded control of a diagnostic imaging PC to non-physicians in violation of New York law; Sawhney unlawfully referred patients to other radiology PCs |

| Prescriber | PC Defendant | Prior Healthcare/No-Fault Fraud Actions |
|---|---|---|
| | | operated and controlled by these non-physicians, per complaint. <br>• *GEICO v. Jacobson*, No. 15-cv-07236-ERK-RML (E.D.N.Y.) <br>   ○ Sawhney unlawfully referred patients to other healthcare providers for medically unnecessary services in exchange for kickback payments disguised as rent, per complaint. <br>• *GEICO v. JB Chiropractic Services, PC*, No. 18-cv-06088-CBA-SJB (E.D.N.Y.) <br>   ○ Sawhney ceded control over medical practices to laypersons and obtained patients, who were subjected to an unnecessary and predetermined treatment protocol, through illegal kickback and referral arrangements, per complaint. |
| Cathy Delerme-Pagan, M.D. | CMI; CMIBK | • *GEICO v. New Century Pharmacy Inc.*, No. 19-cv-06802-ENV-RER (E.D.N.Y.) <br>   ○ Delerme-Pagan entered in an illegal referral arrangement with a pharmacy's owners for the referral of prescriptions of medically unnecessary medications pursuant to a predetermined protocol in exchange for unlawful kickbacks, per complaint. |
| Carline Boubert, PA | CMI | • *GEICO v. Wellmart Rx, Inc.*, No. 19-cv-04414-KAM-RLM (E.D.N.Y.) <br>   ○ Boubert entered into a collusive arrangement with a pharmacy for the referral of fraudulent prescriptions for medically unnecessary drugs and medications in exchange for kickbacks and other financial incentives, per complaint. |
| Colin Clarke, M.D. | CMI | • *Allstate Ins. Co. v. Rose*, No. 22-cv-00279-WFK-MMH (E.D.N.Y.) <br>   ○ Clarke ceded control of a PC to non-physicians and split the PC's fees for medically unnecessary treatments and services billed pursuant to unlawful |

| Prescriber | PC Defendant | Prior Healthcare/No-Fault Fraud Actions |
|---|---|---|
| | | referral arrangements with the non-physicians in violation of New York law, per complaint.<br>• *GEICO v. Exon Medical Equipment, Inc.*, No. 20-cv-02457-RRM-PK (E.D.N.Y.)<br>   o Clarke fraudulently referred prescriptions for medically unnecessary DME to patients pursuant to a predetermined treatment protocol, per complaint. |
| Danilo Sotelo-Garza, M.D. | CMI | • *GEICO v. Triboro Med Supply, Inc.*, No. 16-cv-02079-NGG-SMG (E.D.N.Y.)<br>   o Sotelo-Garza prescribed unnecessary DME in exchange for financial incentives from the company that billed for the DME, per complaint. |
| Gamil Kostandy, M.D. | CMI | • *GEICO v. Healthy Age Medical, P.C.*, No. 19-cv-02398-AMD-VMS (E.D.N.Y.)<br>   o Kostandy ceded control of a PC to laypersons who controlled the clinic at 764 Elmont Road in Elmont, NY; patients were obtained through unlawful payments for referrals and subjected to a predetermined treatment protocol, per complaint. |
| Glen Whitney, DC | CMI | • *GEICO v. Jacques*, No. 14-cv-05299-KAM-VMS (E.D.N.Y.)<br>   o Whitney engaged in unlawful referral arrangements involving the payment of kickbacks in exchange for patient referrals, per complaint.<br>• *GEICO v. Whitney*, No. 18-cv-05013-DLI-SMG (E.D.N.Y.)<br>   o Whitney breached terms of settlement agreement by submitting unlawful charges and engaging in an illegal kickback and referral scheme, per complaint. |
| Helen Shirazi, DC | CMI | • *Allstate Ins. Co. v. Shapson*, No. 22-cv-07125-NRM-TAM (E.D.N.Y.) |

| Prescriber | PC Defendant | Prior Healthcare/No-Fault Fraud Actions |
|---|---|---|
| | | o Shirazi provided medically unnecessary chiropractic treatment pursuant to a predetermined protocol to patients obtained through unlawful kickback arrangements, per complaint. |
| James Avellini, M.D. | CMI | • *Allstate Ins. Co. v. Avellini*, No. 21-cv-04951-BMC (E.D.N.Y.)<br>  o Avellini ceded control of a PC to non-physicians, engaged in unlawful fee splitting, and billed for medically unnecessary treatments and services in furtherance of a No-Fault scheme to defraud, per complaint.<br>• *State Farm Mut. Auto. Ins. Co. v. Corona Med. Plaza, P.C.*, No. 17-cv-00258-FB-VMS (E.D.N.Y.)<br>  o Avellini caused PC to bill for medically unnecessary treatments and tests pursuant to a predetermined protocol as part of a No-Fault scheme to defraud, per complaint.<br>• *GEICO v. Avellini*, No. 15-cv-04070-RJD-MDG (E.D.N.Y.)<br>  o Avellini ceded control of two PCs to non-physicians and engaged in unlawful fee splitting as part of a No-Fault scheme to defraud, per complaint. |
| Jean-Pierre Barakat, M.D. | CMI | • *GEICO v. Barakat*, No. 22-cv-07532-NGG-RML (E.D.N.Y.)<br>  o Barakat ceded control over medical practices in his name to non-physicians who dictated the treatments and services purportedly provided pursuant to illegal referral and kickback arrangements, per complaint.<br>• *GEICO v. Direct Rx Pharmacy, Inc.,* No. 19-cv-05876-FB-LB (E.D.N.Y.)<br>  o Barakat entered into illegal, collusive agreement with a pharmacy and its owner for the referral of prescriptions for unnecessary drugs and medications in exchange for kickbacks, per complaint. |

| Prescriber | PC Defendant | Prior Healthcare/No-Fault Fraud Actions |
|---|---|---|
| | | • *Allstate Ins. Co. v. New Century Pharmacy, Inc.*, No. 19-cv-05702-ENV-VMS (E.D.N.Y.)<br>  ○ Barakat entered into an unlawful relationship with the owner of a pharmacy for referrals of prescriptions for medically unnecessary medications and purported to perform medically unnecessary and excessive treatment, per complaint.<br>• *GEICO v. Barakat*, No. 17-cv-01066-NGG-LB (E.D.N.Y.)<br>  ○ Barakat ceded control of a PC to non-physicians, which PC was caused to submit charges for medically unnecessary treatments pursuant to a predetermined protocol, per complaint. |
| Joseph Bater, DC | CMI | • *State Farm Mut. Ins. Co. v. Tandingan PT, P.C.*, No. 22-cv-01582-EK-CLP (E.D.N.Y.)<br>  ○ Bater ceded control of a PC to laypersons who implemented a predetermined treatment protocol and obtained patients for the PC through illegal kickback and referral arrangements with the owners and controllers of numerous multi-disciplinary clinics, per complaint.<br>• *GEICO v. Chiropractic Diagnostic, P.C.*, No. 20-cv-02046-BMC (E.D.N.Y.)<br>  ○ Bater ceded control over a PC to laypersons who controlled the PC, including by dictating the treatment protocol and orchestrating a kickback scheme for the referral of patients, per complaint.<br>• *GEICO v. JB Chiropractic Services, P.C.*, No. 18-cv-06088-CBA-SJB (E.D.N.Y.)<br>  ○ Bater ceded control over medical practices to laypersons and obtained patients, who were subjected to an unnecessary and predetermined treatment protocol, through illegal kickback and referral arrangements, per complaint. |

| Prescriber | PC Defendant | Prior Healthcare/No-Fault Fraud Actions |
|---|---|---|
| Kamal Tadros, M.D. | CMI | • *GEICO v. Trinity Med., P.C.*, No. 20-cv-03080-NGG-RLM (E.D.N.Y.)<br>  o Tadros participated in a scheme to unlawfully obtain No-Fault benefits, including for medically unnecessary treatment, per complaint. |
| Leonid Litovskiy, PA | CMIBK | • *Liberty Mut. Ins. Co. v. Woodside Chemists, Inc.*, No. 17-cv-06313-ILG-CLP (E.D.N.Y.)<br>  o Litovskiy referred fraudulent prescriptions for medically unnecessary compounded pain creams to a pharmacy in exchange for kickback payments, per complaint. |
| Madhu Boppana, M.D. | CMI | • *GEICO v. Northern Med. Care, P.C.*, No. 20-cv-01214-FB-LB (E.D.N.Y.)<br>  o Boppana billed for medically unnecessary treatments and services pursuant to predetermined protocols for patients obtained through the payment of kickbacks, per complaint. |
| Mani Ushyarov, M.D. | CMI | • *GEICO v. MSB Rx Corp.*, No. 19-cv-00232-NG-PK (E.D.N.Y.)<br>  o Ushyarov participated in a No-Fault fraud scheme involving false and fraudulent prescriptions, per complaint.<br>• *Allstate Ins. Co. v. New Century Pharmacy, Inc.*, No. 19-cv-05702-ENV-VMS (E.D.N.Y.)<br>  o Ushyarov participated in a No-Fault fraud scheme involving fraudulent prescriptions and false medical billing, per complaint.<br>• *GEICO v. Refill Rx Pharmacy Inc.*, No. 18-cv-02823-DLI-PK (E.D.N.Y.)<br>  o Ushyarov participated in a No-Fault fraud scheme involving false and fraudulent prescriptions, per complaint.<br>• *Liberty Mut. Ins. Co. v. Nexray Medical Imaging, P.C.*, No. 12-cv-05666-NGG-VMS (E.D.N.Y.) |

| Prescriber | PC Defendant | Prior Healthcare/No-Fault Fraud Actions |
|---|---|---|
| | | <ul><li>Ushyarov participated in a No-Fault fraud scheme involving fraudulent prescriptions/referrals and false medical billing, per complaint.</li></ul><ul><li>*GEICO v. New Hyde Park Imaging, P.C.*, No. 1:11-cv-01166-FB-ALC (E.D.N.Y.)<ul><li>Ushyarov participated in a No-Fault fraud scheme involving false medical billing, per complaint.</li></ul></li></ul> |
| Maxim Tyorkin, M.D. | CMI | <ul><li>*Allstate Ins. Co. v. Melgar*, No. 22-cv-07634-AMD-SIL (E.D.N.Y.)<ul><li>Tyorkin ceded control of a medical practice to non-physicians and conspired with the non-physicians to bill for medically unnecessary treatment and testing, per complaint.</li></ul></li><li>*GEICO v. CPM Med Supply, Inc.*, No. 17-cv-07041-NG-RLM (E.D.N.Y.)<ul><li>Tyorkin prescribed unnecessary DME pursuant to kickback relationships, per complaint.</li></ul></li><li>*Liberty Mut. Ins. Co. v. Woodside Chemists, Inc.*, No. 17-cv-06313-ILG-CLP (E.D.N.Y.)<ul><li>Tyorkin referred fraudulent prescriptions for medically unnecessary compounded pain creams to a pharmacy in exchange for kickback payments, per complaint.</li></ul></li></ul> |
| Minnie Choi, NP | CMIBK | <ul><li>*GEICO v. Binns*, No. 22-cv-01553-NGG-PK (E.D.N.Y.)<ul><li>Choi ceded control of a healthcare practice to unlicensed laypersons and provided unnecessary treatments and services pursuant to a predetermined protocol to patients obtained through unlawful kickback arrangements, per complaint.</li></ul></li><li>*Liberty Mut. Ins. Co. v. JP Medical Services, P.C.*, No. 22-cv-01487-NRM-LGD (E.D.N.Y.)<ul><li>Choi participated in a scheme to defraud involving billing for medically</li></ul></li></ul> |

| Prescriber | PC Defendant | Prior Healthcare/No-Fault Fraud Actions |
|---|---|---|
| | | unnecessary treatments and services pursuant to a predetermined treatment protocol for patients obtained through unlawful kickbacks, per complaint. |
| Oleg Fuzaylov, M.D. | CMI | • *United States v. Fuzaylov*, No. 19-cr-00581-AMD (E.D.N.Y.)<br>  o Fuzaylov engaged in medical billing fraud involving charges for medical unnecessary physical therapy, per indictment. |
| Pervaiz Qureshi, M.D. | CMI | • *Allstate Ins. Co. v. Shapson*, No. 22-cv-07125-NRM-TAM (E.D.N.Y.)<br>  o Qureshi ceded control of a PC to non-physicians and provided medically unnecessary treatment and services pursuant to a predetermined protocol to patients obtained through unlawful kickback arrangements, per complaint.<br>• *Liberty Mut. Ins. Co. v. Excel Imaging P.C.*, No. 11-cv-05780-JBW-RLM (E.D.N.Y.)<br>  o Qureshi, a nonradiologist, ceded control of a diagnostic imaging PC to non-physicians, per complaint. |
| Phyllis Gelb, M.D. | CMI | • *Liberty Mutual Ins. Co. v. AVK Rx, Inc.*, No. 22-cv-07329-GRB-SIL (E.D.N.Y.)<br>  o Gelb entered into illegal, collusive agreements to prescribe and direct large volumes of prescriptions for predetermined medications to specific pharmacies, per complaint.<br>• *GEICO v. Ahmed*, No. 22-cv-01679-ENV-SJB (E.D.N.Y.)<br>  o Gelb involved in illegal PC ownership and patient referral scheme, per complaint. |
| Radha Gara, M.D. | CMI | • *GEICO v. Wellmart Rx, Inc.*, No. 19-cv-04414-KAM-RLM (E.D.N.Y.)<br>  o Gara entered into a collusive arrangement with a pharmacy for the referral of fraudulent prescriptions for medically unnecessary drugs and |

| Prescriber | PC Defendant | Prior Healthcare/No-Fault Fraud Actions |
|---|---|---|
| | | medications in exchange for kickbacks and other financial incentives, per complaint. |
| Ramy Hanna, M.D. | CMIBK | • *Allstate Ins. Co. v. Rose*, No. 22-cv-00279-WFK-MMH (E.D.N.Y.)<br>○ Hanna ceded control of a PC to non-physicians and split the PC's fees for medically unnecessary treatments and services billed pursuant to unlawful referral arrangements with the non-physicians in violation of New York law, per complaint.<br>• *GEICO v. Exon Medical Equipment, Inc.*, No. 20-cv-02457-RRM-PK (E.D.N.Y.)<br>○ Hanna fraudulently referred prescriptions for medically unnecessary DME to patients pursuant to a predetermined treatment protocol, per complaint. |
| Ruben Oganesov, M.D. | CMI | • *GEICO v. Emmons Avenue Medical Office, P.C.*, No. 22-cv-03922-RPK-PK (E.D.N.Y.)<br>○ Oganesov, who practiced and resided in MA, engaged in illegal referral and kickback arrangements to obtain patients who were purportedly subjected to unnecessary services, per complaint.<br>• *GEICO v. Oganesov*, No. 22-cv-05693-ENV-PK (E.D.N.Y.)<br>○ Oganesov conspired with non-physicians to use a PC to submit fraudulent charges for medically unnecessary services purportedly provided to patients obtained through unlawful referral arrangements, per complaint. |
| Samuel Theagene, M.D. | CMI | • *Allstate Ins. Co. v. Lopez*, No. 14-cv-04826-JS-AKT (E.D.N.Y.)<br>○ Theagene ceded control of a PC to a non-physician and billed for medically unnecessary diagnostic testing services, per complaint. |

| Prescriber | PC Defendant | Prior Healthcare/No-Fault Fraud Actions |
|---|---|---|
| Sayeedus Salehin, M.D. | CMI; CMIBK | • *Allstate Ins. Co. v. Salehin*, No. 21-cv-00420-LDH-VMS (E.D.N.Y.)<br>○ Salehin ceded control of PCs, including a PC operating from Ditmas Avenue, to non-physicians (i.e., Albert Vaynshteyn and Yelena Maksumov) and referred patients for unnecessary MRIs, per complaint.<br>• *21st Century Ins. Co. v. Professional Health Imaging, P.C.*, Index No. 156583/2015 (N.Y. Sup. Ct., New York Cty.)<br>○ Salehin ceded control of a PC to non-physicians (i.e., Vaynshteyn, Albert Vaynshteyn, and Yelena Maksumov, among others), which was engaged in a self-referral scheme with CMI, per complaint.<br>• *Liberty Mut. Ins. Co. v. Bakst*, No. 13-cv-04186-WFK-RML (E.D.N.Y.)<br>○ Salehin ceded control of a PC to non-physicians (i.e., Albert Vaynshteyn and Yelena Maskumov) who caused the PC to bill for medically unnecessary treatment pursuant to a predetermined protocol, per complaint. |
| Todd Lebson, DC | CMIBK | • *Allstate Ins. Co. v. Salehin*, No. 21-cv-00420-LDH-VMS (E.D.N.Y.)<br>○ Lebson ceded control of PCs, including a PC operating from Ditmas Avenue, to non-physicians (i.e., Albert Vaynshteyn and Yelena Maksumov) and billed for medically unnecessary chiropractic treatments, per complaint.<br>• *21st Century Ins. Co. v. Professional Health Imaging, P.C.*, Index No. 156583/2015 (N.Y. Sup. Ct., New York Cty.)<br>○ Lebson ceded control of a PC to non-physicians (i.e., Vaynshteyn, Albert Vaynshteyn, and Yelena Maksumov, among others), per complaint. |
| Tomas Pattugalan, M.D. | CMI | • *Allstate Ins. Co. v. New Century Pharmacy, Inc.*, No. 19-cv-05702-ENV-VMS (E.D.N.Y.) |

| Prescriber | PC Defendant | Prior Healthcare/No-Fault Fraud Actions |
|---|---|---|
| | | o Pattugalan entered into an unlawful relationship with the owner of a pharmacy for referrals of prescriptions for medically unnecessary medications and purported to perform medically unnecessary and excessive treatment, per complaint.<br>• *GEICO v. New Century Pharmacy Inc.*, No. 19-cv-06802-ENV-RER (E.D.N.Y.)<br>o Pattugalan entered into an illegal referral arrangement with a pharmacy's owners for the referral of prescriptions of medically unnecessary medications pursuant to a predetermined protocol in exchange for unlawful kickbacks, per complaint. |
| Viviane Etienne, M.D. | CMI | • *GEICO v. Wellmart Rx, Inc.*, No. 19-cv-04414-KAM-RLM (E.D.N.Y.)<br>o Etienne entered into a collusive arrangement with a pharmacy for the referral of fraudulent prescriptions for medically unnecessary drugs and medications in exchange for kickbacks and other financial incentives, per complaint.<br>• *Allstate Ins. Co. v. Etienne*, No. 09-cv-03582-MKB-RLM (E.D.N.Y.)<br>o Etienne owned PCs that billed for medically unnecessary consults and electrodiagnostic testing performed by independent contractors pursuant to a predetermined treatment protocol, per complaint. |
| Yakov Zilberman, DC | CMI | • *GEICO v. Zilberman*, No. 20-cv-00209-FB-RML (E.D.N.Y.)<br>o Zilberman owned several PCs that billed for medically unnecessary services pursuant to a predetermined treatment protocol for patients obtained through unlawful referral arrangements with unlicensed laypersons who controlled the patient bases, per complaint. |

| Prescriber | PC Defendant | Prior Healthcare/No-Fault Fraud Actions |
|---|---|---|
| | | • *GEICO v. BSZ Chiropractic, P.C.*, No. 12-cv-05536-ENV-RLM (E.D.N.Y.)<br>  o Zilberman owned PCs that billed for nerve conduction velocity tests that were never performed and obtained patients pursuant to unlawful referral arrangements, per complaint.<br>• *Allstate Ins. Co. v. Art of Healing Medicine, P.C.*, No. 15-cv-03639-ENV-RLM (E.D.N.Y.)<br>  o Zilberman owned PCs that billed for medically unnecessary testing services, per complaint. |
| Yvette Davidov, M.D. | CMIBK | • *GEICO v. Bliss Drugs, Inc.*, No. 1:20-cv-04989-FB-JRC (E.D.N.Y.)<br>  o Davidov referred prescriptions for medically unnecessary medications to pharmacy pursuant to collusive arrangement with the pharmacy's owner, per complaint.<br>• *Allstate Ins. Co. v. Etienne*, No. 09-cv-03582-MKB-RLM (E.D.N.Y.)<br>  o Davidov owned a PC that billed for medically unnecessary consults and electrodiagnostic testing performed by independent contractors pursuant to a predetermined treatment protocol, per complaint. |

192.    Patients were steered to CMI and CMIBK and were not given a choice where to undergo the MRIs.

193.    For instance, claimant G.C. (claim no. 0557278678) was seen by Salehin at the 410 Ditmas Avenue clinic just days after the underlying accident, and was promptly referred to CMI for MRIs of her left ankle and left foot:

194. According to G.C., the referring doctor at the 410 Ditmas Avenue clinic "sent" her to CMI for the MRIs and arranged transportation to CMI.

195. Likewise, Salehin referred claimant M.T. (claim no. 0551447188) to CMI for MRIs of the cervical spine and right knee on September 25, 2019:

196.    According to M.T., the referring doctor (i.e., Salehin) "sent" her to CMI in Rosedale

for the MRIs; she also received transportation to the Rosedale Facility because she did not "know

how to get there."

197.    On October 8, 2019, non-party Bhupinder Sawhney, M.D. ("Sawhney") referred claimant L.A. (claim no. 0561802786) to CMI for 6 MRIs of the cervical spine, thoracic spine, bilateral shoulders, and bilateral ankles following the purported motor vehicle accident on September 21, 2019.

198.    According to L.A., Sawhney specifically "sent" her to CMI in Fresh Meadows.

199.    CMI billed Allstate for an MRI of L.A.'s right shoulder even though her "main complaint, of course, was the left [shoulder.] But they took an MRI on my right on the shoulders."

200.    According to L.A., no one at the referring clinic discussed the MRI results with her or made any recommendations based on the MRIs.

201.    CMI also billed Allstate for a lumbar spine MRI for claimant J.N. (claim no. 0549692605) on July 15, 2019 at the Fresh Meadows Facility.

202.    According to J.N., the referring provider made the MRI appointment at CMI.

203.    Overall, the MRIs billed to Allstate by CMI and CMIBK were medically unnecessary and the orders were generated through prohibited patient referral arrangements, which means none of the services were ever compensable under New York's No-Fault laws.  Allstate is therefore entitled to recover all payments it was wrongfully induced to pay to CMI and CMIBK in connection with fraudulent and non-compensable No-Fault claims.

### C.    FRAUDULENT BILLING FOR UNNECESSARY MRIs

204.    CMI and CMIBK billed for MRI services that were unnecessary, premature, and/or without documented clinical indications.

205.    Claimants were referred to CMI or CMIBK for MRIs at the initial visit, often within days of the underlying motor vehicle accident, despite no justification for such early imaging.

206.    Early imaging is defined as MRI scans that are ordered as part of the patient's initial evaluation.

207.    Justification for early imaging of the spinal axis includes clinical concerns for (a) fracture, (b) progressive neurological decline, such as weakness in a limb, (c) compression of the spinal cord resulting in impaired coordination (i.e., myelopathy with ataxia), (d) progressive gait decline, or (e) concerns for malignancy or infection.

208.    Justification for early imaging of a joint includes (a) concern for fracture or dislocation or (b) concerns for malignancy or infection.

209.    Early imaging should not be ordered without documented evidence of these clinical signs; rather, the MRIs should not be ordered until the patient undergoes a course of conservative care consisting of either physical therapy or chiropractic services.

210.    Providers who push early imaging put patients at risk when the results of premature MRIs are used as a basis to order additional unnecessary treatment, including invasive pain management procedures and surgeries.

211.    The representative examples set forth below demonstrate how CMI and CMIBK billed for premature and unnecessary MRIs during the course of this scheme.

      1.      **CMI – False Medical Billing Exemplars**

           *a.      Claimant E.R. (claim no. 0478770712)*

212.    Claimant E.R. was supposedly involved in a motor vehicle accident on October 17, 2017.

213.    E.R. was examined by non-party Tomas Pattugalan, M.D. ("Pattugalan") at non-party GONY Medical Services, P.C. ("GONY") for complaints of pain to her "whole body."

214.    Pattugalan and GONY have a history of involvement in No-Fault schemes that revolved around billing for unnecessary medical services and issuing bogus prescriptions for unnecessary medications.  *See Allstate Ins. Co. v. New Century Pharmacy, Inc.*, No. 19-cv-05702-ENV-VMS (E.D.N.Y.); *GEICO v. New Century Pharmacy Inc.*, No. 19-cv-06802-ENV-RER (E.D.N.Y.).

215.    Despite no attempts at conservative care and despite no clinical indications justifying early imaging, including no concerns of fracture, Pattugalan ordered 5 separate MRIs for E.R.'s left shoulder, left knee, cervical spine, lumbar spine, and thoracic spine by marking a pre-printed check list in the initial examination report:



216.    CMI billed Allstate for the unnecessary left shoulder, left knee, cervical spine, lumbar spine, and thoracic spine MRIs for E.R. at a total combined charge of $4,288.74.

217.    Each of these MRIs was ordered by Pattugalan on the same day, October 19, 2017, but were billed over the course of 4 different dates of service on October 25, 2017 (left shoulder), November 8, 2017 (left knee), November 24, 2017 (cervical and lumbar spine), and December 8, 2017 (thoracic spine) to avoid required reductions for same-day services under the applicable Fee Schedule.

218.    The MRIs billed to Allstate by CMI for E.R. were excessive, medically unnecessary, premature and falsely charged, and therefore not compensable under New York's No-Fault laws.

219.    Overall, Allstate was induced to pay CMI at least $874.97 in connection with No-Fault claims for these false and fraudulent MRIs, and Allstate is entitled to recover all such payments.

### b.      Claimant J.D. (claim no. 0489053132)

220.    Claimant J.D. was purportedly involved in a motor vehicle accident on January 6, 2018.

221.    J.D. then visited the 764 Elmont Road clinic and was examined by non-party Ana Romeo, M.D. ("Romeo") through non-party North Flushing Primary Medical Care, P.C. ("North Flushing") for injuries to his neck, chest, lower back, left shoulder, and left hip.

222.    Romeo and North Flushing Medical also have a history of involvement in No-Fault schemes—both were named in a fraud action involving the unlawful operation and control of North Flushing at the 764 Elmont Road clinic, and Romeo's use of predetermined treatment protocols to generate prescriptions and referrals for unnecessary medical services, including MRIs. *GEICO v. Healthy Age Medical, P.C.*, No. 19-cv-02398-AMD-VMS (E.D.N.Y.).

223.    Despite not affording J.D. any opportunity for conservative care and despite no clinical indications for early imaging, Romeo ordered 2 MRIs of J.D.'s left shoulder and left hip based on J.D.'s complaints of pain.

224.    The clinic at 764 Elmont Road is a well-known hub for No-Fault fraud schemes. *See GEICO v. Healthy Age Medical, P.C.*, No. 19-cv-02398-AMD-VMS (E.D.N.Y.) (alleging that clinic at 764 Elmont Road illegally owned and controlled by unlicensed laypersons); *United States*

*v. Rose*, No. 19-cr-00789-PGG (S.D.N.Y.) (identifying involvement of the clinic at 764 Elmont Road in massive unlawful referral scheme through wiretap records).

225.    J.D. was seen by numerous providers at 764 Elmont Road including non-party Joseph Bater, DC ("Bater") who billed for an examination of J.D. through non-party Trapezius Diagnostic Chiropractic, P.C., an entity owned by non-party Guy Villano, DC ("Villano").

226.    Villano has been the subject of numerous allegations regarding his participation in No-Fault fraud, including schemes involving billing for medically unnecessary testing and illegal referral and kickback arrangements. *See Liberty Mut. Fire Ins. Co. v. Babitz,* No. 20-cv-03238-FB-RML (E.D.N.Y.); *Am. Trans. Ins. Co. v. Akpan*, No. 1:18-cv-04420-ARR-PK (E.D.N.Y.); *GEICO v. Villano*, No. 1:17-cv-07572-WFK-LB (E.D.N.Y.).

227.    Bater also been the subject of multiple lawsuits alleging participation in No-Fault schemes to defraud involving improper financial and illegal kickback and referral arrangements and the purported provision of healthcare services pursuant to a predetermined treatment protocol, including at the clinic at 764 Elmont Road. *See State Farm. Mut. Auto. Ins. Co. v. Tandingan PT P.C.*, No. 22-cv-01582-EK-CLP (E.D.N.Y.); *GEICO v. Chiropractic Diagnostic, P.C.*, No. 20-cv-02046-BMC (E.D.N.Y.); *GEICO v. JB Chiropractic Services, P.C.*, No. 18-cv-06088-CBA-SJB (E.D.N.Y.).

228.    Bater ordered cervical and lumbar spine MRIs for J.D. at the initial examination, which early MRIs also were entirely not indicated.

229.    Bater used a pre-printed check list in the examination report with a pre-supposed basis for the MRIs to indicate the imaging to be ordered:



230. Both Romeo and Bater ordered multiple MRIs for J.D. without affording him any opportunity to undergo conservative care and despite no clinical indications to justify early diagnostic imaging studies.

231. CMI billed Allstate for these 4 unnecessary MRI studies purportedly performed for J.D. on February 12, 2018 and February 20, 2018 for a total charge of $3,132.21.

232. The MRIs billed to Allstate by CMI for J.D. were excessive, medically unnecessary, premature and falsely charged, and therefore not compensable under New York's No-Fault laws.

233. Overall, Allstate was induced to pay CMI at least $3,108.14 in connection with No-Fault claims for these false and fraudulent MRIs, and Allstate is entitled to recover all such payments.

### c.  Claimant M.M. (claim no. 0552625907)

234. Claimant M.M. was purportedly involved in a motor vehicle accident on July 7, 2019.

235. On July 10, 2019, M.M. underwent an initial chiropractic evaluation at a clinic located at 243-51 Merrick Blvd, Rosedale, NY for complaints of pain to the spinal axis, shoulders, thighs, and knees.

236. M.M. was ordered to undergo cervical spine and lumbar spine MRIs within a week of the underlying accident, which was before M.M. could complete a course of conservative therapy.

237. M.M. was then examined by non-party physician Kamal Tadros, M.D. ("Tadros") at the 243-51 Merrick Blvd clinic for complaints of pain to the spinal axis, shoulders, elbows, and knees.

238.    Tadros was named in a lawsuit alleging his participation in a No-Fault fraud scheme involving billing for medically unnecessary treatment pursuant to a predetermined protocol and unlawful referral relationships. *See GEICO v. Trinity Medicine, P.C.*, No. 20-cv-03080-NGG-RLM (E.D.N.Y.).

239.    Tadros ordered 6 medically unnecessary MRIs of M.M.'s bilateral elbows, shoulders, and knees without evidence of any justification for early imaging, and before M.M. could complete a course of conservative therapy.

240.    There was no documentation that M.M. had progressive neurologic decline or concerns for fracture or dislocation of joints.

241.    Overall, CMI billed Allstate a total of $6,624.41 for these 8 unnecessary MRIs for M.M.

242.    Notably, M.M. was only 18 years old at the time of the MRIs, yet CMI submitted reports from McDonnell that found various degenerative-type tears indicating 8 different discogenic injuries, which is a remarkable degree of trauma for a minor motor vehicle accident.

243.    The MRIs billed to Allstate by CMI for M.M. were excessive, medically unnecessary, premature and falsely charged, and therefore not compensable under New York's No-Fault laws. Allstate is entitled to recover all payments it was induced to make to CMI on No-Fault claims for bogus MRIs billed in connection with M.M.

### d.    Claimant D.M. (claim no. 0653021345)

244.    Claimant D.M. purportedly was involved in a motor vehicle accident on December 14, 2021.

245.    D.M. commenced treatment on December 21, 2021 with complaints of pain to the right shoulder, right elbow, and right wrist without radiation or numbness/tingling.

246.     D.M. was seen by non-party Minnie Choi, NP ("Choi") who promptly ordered MRIs of D.M.'s right shoulder, elbow, and wrist even though D.M. had never attempted conservative care.

247.     Choi was involved in No-Fault fraud schemes involving billing for medically unnecessary treatments and services.   *See GEICO v. Binns*, No. 22-cv-01553-NGG-PK (E.D.N.Y.); *Liberty Mut. Ins. Co. v. JP Medical Services, P.C.*, No. 22-cv-01487-NRM-LGD (E.D.N.Y.).

248.     There were no clinical indications for the early imaging studies ordered for D.M.

249.     CMI billed Allstate for the right shoulder, elbow, and wrist MRIs purportedly performed for D.M. in the total amount of $2,899.62.

250.     Choi's progress notes for D.M. do not discuss the results of these MRIs as part of D.M.'s treatment, which demonstrates that these MRIs were not necessary.

251.     On February 21, 2022, an orthopedist recommended that D.M. undergo right shoulder surgery based on the findings of the right shoulder MRI billed by CMI for D.M.

252.     D.M. underwent right shoulder surgery on March 28, 2022, which demonstrates how CMI's unnecessary MRIs served as the foundation for additional billing for unnecessary and invasive treatments.

253.     Overall, the MRIs billed to Allstate by CMI for D.M. were excessive, medically unnecessary, premature and falsely charged, and therefore not compensable under New York's No-Fault laws.  Allstate is entitled to recover all payments it was induced to make to CMI in connection with No-Fault claims for bogus MRIs billed for D.M.

### 2. **CMIBK – False Medical Billing Exemplars**

#### a. *Claimant N.P. (claim no. 0653455774)*

254. Claimant N.P. was purportedly involved in a motor vehicle accident on December 8, 2021.

255. N.P. underwent an initial evaluation on December 16, 2021 with a physician for reported pain in both shoulders.

256. Despite no conservative care having been performed for N.P. as of December 16, 2021, the physician ordered bilateral shoulder MRI scans for N.P.

257. N.P. did not present with any clinical indications to justify early shoulder imaging studies.

258. Additionally, although the ordering physician documented N.P.'s complaints of bilateral shoulder pain, other providers examining N.P. on or about the same date documented only left shoulder pain.

259. CMIBK billed Allstate a total of $1,691.45 for unnecessary bilateral shoulder MRIs purportedly performed for N.P. on January 21, 2022.

260. Overall, the MRIs billed to Allstate by CMIBK for N.P. were excessive, medically unnecessary, premature and falsely charged, and therefore not compensable under New York's No-Fault laws. Allstate is entitled to recover all payments it was induced to make to CMIBK in connection with No-Fault claims for bogus MRIs billed for N.P.

#### b. *Claimant D.D. (claim no. 0634243802)*

261. Claimant D.D. was purportedly involved in a motor vehicle accident on July 18, 2021.

262.   D.D. was initially examined by non-party Salehin on July 30, 2021 at Brooklyn Medical Practice, P.C. located at 410 Ditmas Ave, Brooklyn, NY, which clinic was allegedly unlawfully operated and controlled by Albert and Yelena (i.e., Vaynshteyn's family members). *See Allstate Ins. Co. v. Salehin*, No. 21-cv-00420-LDH-VMS (E.D.N.Y.).

263.   Even though D.D. had not received any conservative care, Salehin ordered 4 separate MRI scans for the bilateral shoulders, left knee, and left ankle at this initial examination based on D.D.'s complaint of pain to these areas.

> ❖ *MRI of the bilateral shoulder to rule out soft tissue injury*
> ❖ *MRI of the left knee to rule out soft tissue injury*
> ❖ *MRI of the left ankle to rule out soft tissue injury*

264.   However, orders for only 2 of these MRIs were actually submitted, thus showing that Salehin's recommendations for MRIs were meaningless.

265.   Specifically, 2 separate MRI order forms on CMI letterhead were submitted by Salehin for just the left knee MRI and left shoulder MRI for D.D.

266.   Despite both MRIs being ordered by Salehin at the initial examination, the order forms are dated August 3, 2021 for the left shoulder MRI and August 31, 2021 for the left knee MRI, which is the date of service for each respective MRI.

267.   Even though there was no documentation of any clinical signs justifying the early imaging ordered for D.D. by Salehin, CMIBK billed Allstate a total of $1,933.08 for these 2 MRIs.

268.   Allstate was induced to pay CMI at least $973.63 for these medically unnecessary services.

269.   This unjustified early imaging of D.D.'s left shoulder led to further unnecessary care.

270.     D.D. underwent an orthopedic consultation for the left shoulder even though CMIBK's report for left shoulder MRI showed mild degenerative-type changes.

271.     Despite no significant attempts at conservative care for D.D.'s left shoulder, the unjustified early imaging of D.D.'s left shoulder ultimately led to a shoulder orthopedic surgery just 6 weeks following the underlying motor vehicle accident.

272.     Overall, the MRIs billed to Allstate by CMIBK for D.D. were excessive, medically unnecessary, premature and falsely charged, and therefore not compensable under New York's No-Fault laws.  Allstate is entitled to recover all payments it was induced to make to CMIBK in connection with No-Fault claims for bogus MRIs billed for D.D.

### c.     Claimant P.G. (claim no. 0635965510)

273.     P.G. purportedly was involved in a motor vehicle accident on August 2, 2021.

274.     P.G. complained of only left hand pain at the hospital following the accident and denied numbness and tingling; no fracture or dislocation was visualized in the left wrist and left hand x-ray.

275.     Just 2 days later, P.G. was examined by Salehin at the 410 Ditmas Avenue clinic for complaints of head pain, neck pain, mid and low back pain, left hand pain, bilateral shoulder pain, and bilateral knee pain.

276.     Salehin's initial examination report does not reference the results of P.G.'s left hand and wrist x-rays taken at the hospital, which were negative for fracture.

277.     Even though P.G. had not received any treatment for injuries supposedly sustained in the underlying motor vehicle accident, Salehin recommended 3 separate MRIs of P.G.'s left knee, left shoulder, and left hand at the initial examination:

❖ *MRI of the left shoulder to rule out soft tissue injury*
❖ *MRI of the left knee to rule out soft tissue injury*
❖ *MRI of the left hand to rule out soft tissue injury*

278.   Despite being recommended together at the initial examination, the 3 MRIs were ordered and referred to CMIBK by Salehin's physician assistant using separate order forms dated for the same day as the date of service; at least one of these forms appears to be signed using a stamp:



279.   Even if these 3 MRIs were properly prescribed, none were justified based on P.G.'s presenting symptoms and examination results.

280.   CMIBK billed a total of $2,775.66 to Allstate for the MRIs of P.G.'s left knee, left shoulder, and left hand.

281.   The unjustified left shoulder MRI led to additional medically unnecessary treatment for P.G., who underwent left shoulder arthroscopic surgery after being seen by an orthopedist at the 410 Ditmas Avenue clinic.  The surgery was ordered after CMIBK's MRIs, and just 2 weeks following the purported underlying accident and before P.G. could complete a course of conservative care.

282.   The MRIs billed to Allstate by CMIBK for P.G. were excessive, medically unnecessary, premature and falsely charged, and therefore not compensable under New York's No-Fault laws.  Allstate is entitled to recover all payments it was induced to make to CMIBK in connection with No-Fault claims for bogus MRIs billed for P.G.

#### d.     Claimant D.I. (claim no. 0654387406)

283.    Claimant D.I. was purportedly involved in a motor vehicle accident on or about December 12, 2021.

284.    On December 20, 2021, D.I. was examined by non-party physician Ramy Hanna, M.D. ("Hanna") at non-party Bay Medical, P.C. ("Bay Medical").

285.    Both Hanna and Bay Medical are accused of billing for unnecessary services for patients of Bay Medical, including ordering premature and medically unnecessary MRIs.  *See Allstate Ins. Co. v. Rose*, No. 22-cv-00279-WFK-MMH (E.D.N.Y.).

286.    Indeed, Hanna ordered MRIs of D.I.'s cervical and lumbar spine by circling the specified body parts in the report of the December 20, 2021 initial examination despite no documentation as to progressive neurologic decline and before any significant attempt at conservative care:



287.    Subsequently, however, on January 19, 2022, Hanna ordered the lumbar spine MRI for D.I. using an unsigned CMI order form:

288.    CMIBK billed Allstate $1,003.20 for the unnecessary MRI of D.I.'s lumbar spine on January 24, 2022.

289.    However, CMIBK did not bill Allstate for D.I.'s cervical spine MRI until March 15, 2022 even though it was supposedly ordered on January 19, 2022.

290.    Hanna never discussed the results of D.I.'s MRIs in subsequent treatment notes and records, which demonstrates that the MRIs billed by CMIBK for D.I. were not medically necessary.

### D.    FRAUDULENT BILLING PRACTICES

#### 1.    Excessive Charges for Radiology Services

291.    The Fee Schedule contains "Ground Rules" for billing radiology services.

292.    The Defendants manipulated CMI's and CMIBK's submission of charges under New York's No-Fault laws to circumvent the Fee Schedule's required "adjustments" that providers must make to their charges for "Multiple Diagnostic Procedures" under Radiology Ground Rule 3.

293.    Pursuant to Radiology Ground Rule 3(A)-(C), when 2 or more body parts are imaged in the same session, the provider must discount the procedure with the lesser fee by 50% (for 2 contiguous parts) or 25% (for 2 remote (e.g., bilateral) parts or for 3 or more parts, whether contiguous or remote).

294.    "This discounting [under Radiology Ground Rule 3] furthers two goals of the No-Fault statute: reducing cost to consumers and discouraging fraud." *Brentwood Pain & Rehab. Servs., P.C. v. Allstate Ins. Co.*, 508 F. Supp. 2d 278, 294 (S.D.N.Y. 2007).

295.    For services rendered on or after October 1, 2020, Ground Rule 3(F) was amended to state that "Imaging studies taken within 7 days of the first x-ray/imaging studies and related to

64

the injury or problem necessitating the first x-ray/imaging studies, and which could have been reasonably performed at one time, shall be subject to" Radiology Ground Rule 3's discounting requirements.

296.    After October 1, 2020, the PC Defendants frequently submitted charges for a series of MRI studies, which were ordered by the same referring provider on the same date, but were purportedly performed on different dates of service intentionally separated by approximately 7 days to avoid the required reductions to the amounts charged under Radiology Ground Rule 3.

297.    For example, CMIBK submitted an undated order form regarding claimant A.C. (claim no. 0660961723) from non-party referring provider Ashraf Salem, M.D. ("Salem") in support of its charges to Allstate for MRIs of A.C.'s cervical, thoracic, lumbar spine, and left shoulder purportedly performed on the following dates:

| Claimant | DOL | Description of Services | DOS | Days From Last Service | Amount Charged |
|---|---|---|---|---|---|
| A.C. (claim no. 0660961723) | 2/22/22 | Right shoulder MRI | 3/7/2022 | N/A | $966.54 |
| A.C. (claim no. 0660961723) | 2/22/22 | Thoracic Spine MRI | 3/15/2022 | 8 days | $1,055.57 |
| A.C. (claim no. 0660961723) | 2/22/22 | Cervical Spine MRI | 3/23/2022 | 8 days | $967.70 |
| A.C. (claim no. 0660961723) | 2/22/22 | Lumbar Spine MRI | 3/31/2022 | 8 days | $1,003.20 |
| | | | | **TOTAL** | **$3,993.01** |

298.    CMIBK intentionally billed Allstate for 4 separate MRIs performed for A.C. on 4 separate dates of service spaced 8 days apart, which was just long enough to avoid triggering Radiology Ground Rule 3(F) requiring CMIBK to apply a reduction to its charges.

299.    There were no medical reasons to stagger A.C.'s MRIs; in fact, subjecting A.C. to 4 different visits over the span of several weeks needlessly exposed A.C. to additional radiation, plus the risk of illness or infection.

300.    Each of McDonnell's MRI reports note that the "[a]dditional sanitizing/safety protocols recommended by the CDC were performed."   Accordingly, had the studies been performed at the same time, CMIBK could have saved A.C. and its staff potential exposure to illness and the time to staff in performing these additional safety protocols.

301.    If CMIBK had performed these 4 studies in 1 day, or on dates of service within 7 days, it would only have been entitled to charge $3,258.65 representing the greatest fee ($1,055.57), plus 75% of the total of the less fees ($2,203.08), for a total of $3,258.65, which is over $700 less than the total charges to Allstate by CMIBK for the 4 imaging studies purportedly rendered to A.C.

302.    Therefore, the Defendants were motivated to manipulate MRI billing to move multiple diagnostic procedures outside of the application of Radiology Ground Rule 3, which enabled them to maximize the amounts billed by CMI and CMIBK.

303.    For example, 5 separate MRIs were ordered for claimant I.Z. (claim no. 0671781813) using the same undated order form.

304.    However, CMIBK billed I.Z.'s MRIs over 4 different dates of service separated by between 8 days and 11 days.

305.    The below chart provides illustrates CMIBK's billing for multiple diagnostic procedures as to claimant I.Z. to avoid the reductions required under Radiology Ground Rule 3:

| Claimant | DOL | Description of Services | DOS | Days From Last Service | Amount Charged |
|---|---|---|---|---|---|
| I.Z. (claim no. 0671781813) | 5/19/22 | Right Shoulder MRI | 6/21/2022 | N/A | $966.54 |
| I.Z. (claim no. 0671781813) | 5/19/22 | Left Shoulder MRI | 6/29/2022 | 8 days | $966.54 |
| I.Z. (claim no. 0671781813) | 5/19/22 | Thoracic Spine MRI | 7/8/2022 | 9 days | $1,055.57 |
| I.Z. (claim no. 0671781813) | 5/19/22 | Cervical Spine MRI; Lumbar Spine MRI | 7/19/2022 | 11 days | $725.78; $1,003.20 |
| | | | | TOTAL | $4,717.63 |

306.    If CMIBK had billed for these 5 MRIs on the same date of service or dates of service within 7 days, it would only have been permitted to charge the highest fee ($1,055.57) plus 75% of the total of the lesser fees ($2,927.99), which is more than $700 less than the total amount billed for these MRIs.

307.    CMIBK also purposely billed for spinal axis MRIs in a certain order to avoid application of the fee reductions required by Radiology Ground Rule 3.

308.    For example, 3 spinal axis MRIs were ordered for claimant L.K. (claim no. 0667413009) on April 28, 2022.

309.    CMIBK first billed for the MRI of L.K.'s thoracic spine on May 18, 2022, which has the highest fee under the applicable Fee Schedule of $1,055.57.

310.    CMIBK next billed for L.K.'s cervical spine and lumbar spine MRIs 7 days later on May 25, 2022.

311.    The Defendants avoided the required reductions to its fees for multiple diagnostic procedures under the applicable Fee Schedule by billing the cervical spine and lumbar spine MRIs 7 days after the thoracic spine MRI.

312.    Had CMIBK billed for all 3 MRIs of L.K.'s spinal axis on the same day, the charges for L.K.'s cervical spine and lumbar spine MRIs would have been reduced by 25%.

313.    Therefore, CMIBK intentionally billed for the MRI of L.K.'s thoracic spine first to capture the greatest charge, then waited 7 days to perform the remaining 2 MRIs of L.K.'s cervical and lumbar spines as remote parts requiring only a 25% reduction to the lesser charge.

314.    Likewise, CMI billed Allstate for 5 MRIs of the spinal axis and bilateral knees for claimant M.B. (claim no. 0655920452), which all were ordered by the same referring provider, Minnie Choi, NP, on January 20, 2022.

315.    However, CMI intentionally billed for M.B.'s MRIs over the course of 3 dates of service, each separated by 8 days.

316.    The below chart provides illustrates CMI's billing for multiple diagnostic procedures as to claimant M.B. to avoid the reductions required under Radiology Ground Rule 3:

| Claimant | DOL | Description of Services | DOS | Days From Last Service | Amount Charged |
|---|---|---|---|---|---|
| M.B. (claim no. 0655920452) | 1/14/22 | Thoracic Spine MRI | 2/14/22 | N/A | $1,055.57 |
| M.B. (claim no. 0655920452) | 1/14/22 | Cervical Spine MRI; Lumbar Spine MRI | 2/22/22 | 8 days | $725.78; $1,003.20 |
| M.B. (claim no. 0655920452) | 1/14/22 | Right Knee MRI; Left Knee MRI | 3/2/22 | 8 days | $724.91; $966.54 |
| | | | | **TOTAL** | **$4,476.00** |

317.    If M.B.'s MRIs were not deliberately spaced apart, then CMI's total charges would have been reduced.

318.    Similarly, CMI billed Allstate for 4 MRIs of the spinal axis and right shoulder purportedly performed for claimant S.S. (claim no. 0665534961), which all were ordered by the same referring provider, Minnie Choi, NP, on March 24, 2022.

319.    However, CMI intentionally billed for the services purportedly performed for S.S. over the course of 3 dates of service separated by 8 or 10 days.

320.    The below chart illustrates CMI's billing for multiple diagnostic procedures as to claimant S.S. to avoid the reductions required under Radiology Ground Rule 3:

| **Claimant** | **DOL** | **Description of Services** | **DOS** | **Days From Last Service** | **Amount Charged** |
|---|---|---|---|---|---|
| S.S. (claim no. 0665534961) | 3/21/22 | Right Shoulder MRI | 4/14/22 | N/A | $966.54 |
| S.S. (claim no. 0665534961) | 3/21/22 | Cervical Spine MRI; Lumbar Spine MRI | 4/22/22 | 8 days | $725.78; $1,003.20 |
| S.S. (claim no. 0665534961) | 3/21/22 | Thoracic Spine MRI | 5/2/22 | 10 days | $1,005.57 |
| | | | | **TOTAL** | **$3,701.09** |

321.    CMI's charges for S.S. would have been reduced if the MRIs were not spaced apart from each other.

322.    These examples demonstrate how the Defendants manipulated New York's No-Fault laws to maximize the amounts that CMI and CMIBK could bill Allstate for unnecessary diagnostic imaging services.

**2.    PC Defendants' Failure to Determine Whether Imaging Was Medically Necessary**

323.    Under New York's No-Fault laws, providers are not entitled to seek or collect payments for unnecessary radiology services, including MRIs.

324.    Pursuant to Radiology Ground Rule 7 of the applicable Fee Schedule, "[w]hen a patient is referred to radiologists…for services covered in the Radiology Section, they shall evaluate the patient's problem and determine if the services or procedures are medically necessary. Such evaluation and necessary consultation with the referring physician is an *integral* part of the professional component relative value unit and does not merit any additional charges." (emphasis added).

325.    The amounts charged by the PC Defendants to Allstate necessarily included the "integral" consultation with the provider referring the Allstate claimant to the PC Defendants for the diagnostic imaging services.

326.    McDonnell did not take any steps to determine whether these services were medically necessary.

327.    According to McDonnell, no medical necessity analysis was completed at CMI beyond the "front desk person" reviewing the patient's reported history and determining whether it matched with the MRI study ordered.

328.    As noted above, the PC Defendants routinely submitted charges for diagnostic imaging services that were not clinically indicated and were performed before the claimants were afforded the opportunity to undergo conservative care without any justification for urgent imaging.

329.    For example, as illustrated by the representative examples in the chart below, the portion of the reports signed by McDonnell reciting the patient's "history" often only cited to the patient's pain or trauma, even though pain or trauma, standing alone, is an insufficient basis to justify diagnostic imaging.

| Claimant Initials | Claim No. | DOL | Date of Service | MRI | PC Defendant | Reading Radiologist | Recited "History" |
|---|---|---|---|---|---|---|---|
| D.M. | 0653021345 | 12/14/21 | 1/6/22 | Right Elbow | CMI | McDonnell | Pain. |
| J.D. | 0489053132 | 1/6/18 | 2/12/18 | Left Hip | CMI | McDonnell | Pain. |
| J.D. | 0489053132 | 1/6/18 | 2/12/18 | Left Shoulder | CMI | McDonnell | Pain. |
| E.R. | 0478770712 | 10/17/17 | 11/24/17 | Lumbar Spine | CMI | McDonnell | Trauma. |
| E.C. | 0330470238 | 6/14/14 | 7/24/14 | Left Shoulder | CMI | McDonnell | MVA. Pain. |
| M.S. | 0391823416 | 10/28/15 | 12/8/15 | Right Shoulder | CMI | McDonnell | Shoulder pain, MVA. |
| K.G. | 0396950131 | 1/1/16 | 2/3/16 | Cervical Spine | CMI | McDonnell | MVA. |
| M.P. | 0530203207 | 1/2/219 | 1/20/19 | Left Ankle | CMI | McDonnell | Pain, history of trauma. |
| S.M. | 0577293244 | 1/30/20 | 2/13/20 | Right Knee | CMI | McDonnell | Knee pain. |
| G.J. | 0610421497 | 12/11/20 | 2/16/21 | Left Shoulder | CMI | McDonnell | Shoulder pain, superolateral pain. |
| D.I. | 0654387406 | 12/12/21 | 1/24/22 | Lumbar Spine | CMIBK | McDonnell | Sharp pain. |
| P.G. | 0635965510 | 8/2/21 | 10/29/21 | Left Shoulder | CMIBK | McDonnell | Sharp pain. |
| A.R. | 0669739236 | 5/4/22 | 5/13/22 | Right Hip | CMIBK | McDonnell | Pain. |
| A.C. | 0660961723 | 2/22/22 | 3/23/22 | Cervical Spine | CMIBK | McDonnell | Neck pain. |
| R.N. | 0662192467 | 3/11/22 | 5/16/22 | Right Shoulder | CMIBK | McDonnell | Pain. |

330.    CMI and CMIBK routinely billed Allstate for MRIs within days of the reported accidents.   The MRIs were ordered without indications for urgent imaging and before the completion of conservative treatment, as illustrated by the representative examples in the chart below:

| Claimant Initials | Claim No. | Date of Loss | Date of Service | MRI | PC Defendant |
|---|---|---|---|---|---|
| K.A. | 0577771041 | 2/9/2020 | 2/12/2020 | Right wrist | CMI |
| R.L. | 0520768540 | 10/9/2018 | 10/11/2018 | Brain | CMI |
| J.G. | 0592124564 | 7/6/2020 | 7/9/2020 | Right knee | CMI |

| Claimant Initials | Claim No. | Date of Loss | Date of Service | MRI | PC Defendant |
|---|---|---|---|---|---|
| S.P. | 0566477989 | 10/21/2019 | 10/24/2019 | Left shoulder | CMI |
| K.S. | 0327136859 | 5/6/2014 | 5/9/2014 | Left knee | CMI |
| H.R. | 0405632076 | 3/5/2016 | 3/8/2016 | Right shoulder | CMI |
| R.Y. | 0570469064 | 12/3/2019 | 12/6/2019 | Left shoulder | CMI |
| D.B. | 0544995177 | 5/6/2019 | 5/9/2019 | Left shoulder | CMI |
| S.R. | 0558532842 | 8/24/2019 | 8/27/2019 | Right hip | CMI |
| A.P. | 0434335675 | 10/31/2016 | 11/3/2016 | Right hip | CMI |
| W.C. | 0597506187 | 8/24/2020 | 8/28/2020 | Left shoulder | CMI |
| R.Z. | 0611597849 | 1/4/2021 | 1/8/2021 | Right wrist | CMI |
| M.Z. | 0607567625 | 11/20/2020 | 11/24/2020 | Thoracic spine | CMI |
| C.C. | 0459530126 | 6/5/2017 | 6/11/2017 | Right shoulder | CMI |
| N.F. | 0480832468 | 10/30/2017 | 11/6/2017 | Right shoulder | CMI |
| M.A. | 0449436954 | 3/16/2017 | 3/24/2017 | Right ankle | CMI |
| H.L. | 0504386749 | 5/20/2018 | 5/30/2018 | Left shoulder; Right knee | CMI |
| P.C. | 0629565648 | 6/14/2021 | 6/24/2021 | Left shoulder | CMI |
| S.S. | 0631561024 | 6/17/2021 | 6/29/2021 | Right knee | CMI |
| S.T. | 0679160119 | 7/30/2022 | 8/8/2022 | Left shoulder | CMI |
| B.L. | 0676969363 | 7/13/2022 | 7/29/2022 | Cervical spine | CMI |
| S.K. | 0674478862 | 6/19/2022 | 6/28/2022 | Right and left knee | CMI |
| T.C. | 0522426691 | 10/27/2018 | 11/8/2018 | Left shoulder | CMI |
| C.J. | 0675807127 | 7/3/2022 | 7/27/2022 | Left shoulder | CMIBK |
| R.M. | 0681893715 | 8/22/2022 | 9/12/2022 | Right shoulder | CMIBK |
| P.G. | 0635965510 | 8/2/2021 | 8/6/2021 | Left knee | CMIBK |
| L.A. | 0634243802 | 7/18/2021 | 8/3/2021 | Left shoulder | CMIBK |
| M.A. | 0649371093 | 11/12/2021 | 11/18/2021 | Right knee | CMIBK |
| I.H. | 0643021009 | 9/25/2021 | 10/18/2021 | Brain | CMIBK |
| M.C. | 0653812784 | 12/12/2021 | 12/20/2021 | Left knee | CMIBK |
| R.R. | 0657895776 | 1/25/2022 | 1/28/2022 | Left shoulder | CMIBK |
| Z.N. | 0662192467 | 3/11/2022 | 3/21/2022 | Cervical spine | CMIBK |
| M.A. | 0662192467 | 3/11/2022 | 3/18/2022 | Right wrist | CMIBK |
| L.G. | 0661863779 | 3/3/2022 | 3/15/2022 | Right elbow | CMIBK |
| M.B. | 0662192467 | 3/11/2022 | 3/21/2022 | Right shoulder | CMIBK |
| L.K. | 0667413009 | 4/26/2022 | 5/18/2022 | Thoracic spine | CMIBK |
| M.A. | 0662192467 | 3/11/2022 | 3/18/2022 | Right wrist | CMIBK |
| A.P. | 0668526189 | 4/20/2022 | 5/16/2022 | Right knee | CMIBK |
| A.R. | 0669739236 | 5/4/2022 | 5/13/2022 | Right hip | CMIBK |

331. The Defendants ignored their obligations to ensure that the diagnostic imaging studies billed to Allstate were medically necessary, and CMI and CMIBK failed to comply with Radiology Ground Rule 7 when submitting bills to Allstate.

## VI.   SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

332. Vaynshteyn and McDonnell, working through CMI, CMIBK, and Global Stone, (a) created, prepared, and submitted (or caused to be created, prepared, and submitted) false medical documentation, (b) intentionally violated the laws of the United States by devising, and intending to devise, schemes to defraud and obtain money and property by means of false and fraudulent pretenses in representations, and (c) placed, or caused to be placed, in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing, or attempting, such fraudulent schemes.

333. Unless otherwise pled to the contrary, all documents, notes, reports, invoices, health insurance claim forms, assignment of benefit forms, other No-Fault claim reimbursement documents, letters, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

334. Every automobile insurance claim detailed within this Complaint involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claim-related payments, and the return of the cancelled payment instruments to the financial institution(s) from which the draft(s) were drawn.

335. The Defendants either personally used (or caused the use of) the U.S. Mail to further this fraudulent scheme by causing medical bills/invoices and records from the PC Defendants to be mailed to Allstate (and/or counsel for claimants), or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

### A.     CMI ENTERPRISE

336.    Vaynshteyn and McDonnell caused CMI to falsely certify that it was eligible to be reimbursed under New York's No-Fault Laws each time that CMI mailed (or was caused to mail) a demand for payment (i.e., invoice or bill) to Allstate.

337.    Vaynshteyn's participation in the management and control of CMI, combined with Vaynshteyn's unlawful receipt of CMI's professional physician fees and profits, rendered CMI completely ineligible for No-Fault reimbursement under New York law.

338.    Because CMI was, in fact, unlawfully controlled by Vaynshteyn (a person who was not licensed to practice medicine, or allowed to operate, control, or profit from a professional corporation organized to provide medical services), Vaynshteyn and McDonnell purposely caused CMI to make a misrepresentation each and every time that CMI mailed (or was caused to mail) a document to Allstate claiming eligibility for reimbursement.

339.    Moreover, because (a) Vaynshteyn, as a non-physician, was never lawfully permitted to participate in the operation and management of CMI, (b) Vaynshteyn caused CMI to seek No-Fault reimbursement from Allstate (even though CMI was not lawfully entitled to such reimbursement), and (c) CMI used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Vaynshteyn and McDonnell committed mail fraud.

340.    At all relevant times, Vaynshteyn and McDonnell knew that CMI (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other medical provider, or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed by (or on behalf of) CMI.

341.    Allstate estimates that the unlawful operation of the CMI enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 1 and incorporated by reference as if set forth in its entirety.

**B.    CMIBK ENTERPRISE**

342.    Vaynshteyn, McDonnell, and Global Stone caused CMIBK to falsely certify that it was eligible to be reimbursed under New York's No-Fault Laws each time that CMIBK mailed (or was caused to mail) a demand for payment (i.e., invoice or bill) to Allstate.

343.    Vaynshteyn's participation in the management and control of CMIBK (through Global Stone), combined with Vaynshteyn's unlawful receipt of CMIBK's professional physician fees and profits, rendered CMIBK completely ineligible for No-Fault reimbursement under New York law.

344.    Because CMIBK was, in fact, unlawfully controlled by Vaynshteyn (a person who was not licensed to practice medicine, or allowed to operate, control, or profit from a professional corporation organized to provide medical services), Vaynshteyn, McDonnell, and Global Stone purposely caused CMIBK to make a misrepresentation each and every time that CMIBK mailed (or was caused to mail) a document to Allstate claiming eligibility for reimbursement.

345.    Moreover, because (a) Vaynshteyn, as a non-physician, was never lawfully permitted to participate in the operation and management of CMIBK, (b) Vaynshteyn caused CMIBK to seek No-Fault reimbursement from Allstate (even though CMIBK was not lawfully entitled to such reimbursement), and (c) CMIBK used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Vaynshteyn and McDonnell committed mail fraud.

346.    At all relevant times, Vaynshteyn and McDonnell knew that CMIBK (including its employees, owner(s), contractors, and agents), Global Stone, a patient, a claimant, an insurance

carrier, patient's attorney, other medical provider, or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed by (or on behalf of) CMIBK.

347.    Allstate estimates that the unlawful operation of the CMIBK enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 2 and incorporated by reference as if set forth in its entirety.

###    C.    GLOBAL STONE ENTERPRISE

348.    Vaynshteyn knowingly used Global Stone to exert control over the operation and management of CMIBK, including its finances.

349.    In furtherance of the operation and management of the Global Stone enterprise, Vaynshteyn and McDonnell either personally used (or caused the use of) the U.S. Mail to further this fraudulent scheme by causing Allstate claimants' medical records and invoices from CMIBK to be mailed to Allstate (and/or counsel for claimants), or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

350.    As explained above, Vaynshteyn and McDonnell caused CMIBK to falsely certify that it was eligible to be reimbursed under New York's No-Fault laws each time that CMIBK mailed (or was caused to mail) a demand for payment (i.e., invoice or bill) to Allstate.

351.    As a result of the above-described conduct, Vaynshteyn and McDonnell purposely caused CMIBK to make a misrepresentation each and every time that CMIBK mailed (or was caused to mail) a document to Allstate claiming eligibility for No-Fault reimbursement even though, at all relevant times, CMIBK was not entitled to such reimbursement under New York law.

352.    Vaynshteyn and McDonnell also caused Global Stone to use the U.S. Mail in the course of conducting its business of providing office space lease, equipment lease, and maintenance services (or in the course of purporting to provide lease or maintenance services) to CMIBK even though any such services were, in reality, a smokescreen concealing Vaynshteyn's involvement in expanding and controlling CMIBK's businesses, including his personal enrichment from the operation of the CMIBK enterprise.

353.    At all relevant times, Vaynshteyn and McDonnell knew that CMIBK (including its employees, owner(s), contractors, and agents), Global Stone, a customer, an Allstate claimant, an insurance carrier, an Allstate claimants' attorney, other medical provider, or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed by (or on behalf of) CMIBK.

354.    These payments issued by Allstate though the U.S. Mail in reliance on the false and fraudulent documentation mailed by (or on behalf of) CMIBK were diverted to Global Stone for the benefit of Vaynshteyn through certain transactions engaged in between the CMIBK and Global Stone—and other transactions designed to conceal Vaynshteyn's receipt of CMIBK's professional fees and profits—including transactions arising out of the sham agreement for lease and maintenance services with Global Stone.

355.    As a result of the above-described conduct, it is clear that Vaynshteyn and McDonnell committed mail fraud in the furtherance of the operation and management of the Global Stone enterprise.

356.    Allstate estimates that the unlawful operation of the Global Stone enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in

furtherance of this scheme is annexed at Exhibit 2 and incorporated herein by reference as if set forth in its entirety.

## VII.  SPECIFIC ALLEGATIONS OF FRAUDULENT CONCEALMENT AND MISREPRESENTATIONS MADE TO AND RELIED ON BY ALLSTATE

### A.  CMI ENTERPRISE

357.  McDonnell is registered with the State of New York as CMI's sole officer, director, and shareholder.

358.  Vaynshteyn induced McDonnell to cede control over the operation and management of CMI to Vaynshteyn during the relevant period.

359.  The documents created and filed with the State of New York related to CMI deliberately omitted any reference to Vaynshteyn's involvement with CMI.

360.  Based on the representations contained within the documents filed with the State of New York on behalf of CMI, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Vaynshteyn's domination and control over McDonnell and CMI.

361.  Vaynshteyn took purposeful steps to conceal his involvement in the day-to-day operations of CMI.

362.  The purposeful concealment of Vaynshteyn's controlling interests in CMI allowed Vaynshteyn to unlawfully control CMI undetected.

363.  Overall, the purposeful concealment of Vaynshteyn's controlling interests in CMI enabled him to violate New York law while also preventing Allstate from discovering his unlawful acts for a prolonged period.

364.  At all relevant times during the operation of the CMI enterprise, to induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who treated at

CMI, McDonnell and Vaynshteyn caused CMI to falsely certify that it was eligible to be reimbursed under New York's No-Fault Laws.

365. Because Vaynshteyn was not licensed to practice medicine, or allowed to operate, control, or profit from a professional corporation organized to provide professional physician services, and because CMI was organized as a physician-owned professional service corporation, Vaynshteyn was never lawfully entitled to participate in, or in any way direct, the operation and management of CMI.

366. Accordingly, because Vaynshteyn unlawfully participated in the operation and management of CMI throughout the relevant period, CMI was caused to falsely claim eligibility for No-Fault reimbursement each and every time that it sought No-Fault reimbursement from Allstate.

367. Further, McDonnell attested (or caused the attestation) to the medical necessity of the services allegedly performed in connection with CMI's patients.

368. At all relevant times, McDonnell, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity.

369. As alleged above, McDonnell (or those persons acting under his control) caused CMI to create and submit to Allstate treatment records and demands for payment relative to medical services that were (a) unnecessary, (b) charged at excessive rates, and (c) performed pursuant to an unlawful referral relationship.

370. Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

371. Many of these facts—particularly (a) Vaynshteyn's involvement in the direction and control of the diagnostic imaging purportedly rendered for CMI's patients, and (b) CMI's

unlawful splitting of professional fees and profits with Vaynshteyn are not readily evident within the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim.

372.    Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for treatment that was provided in accord with all applicable New York state licensing requirements.

373.    Thus, every time that McDonnell and Vaynshteyn caused CMI to submit No-Fault reimbursement demands to Allstate, Vaynshteyn and McDonnell (and those individuals working under their control) necessarily certified that CMI was eligible to be reimbursed under New York's No-Fault Laws.

374.    The full extent of Vaynshteyn's and McDonnell's fraudulent and unlawful acts relative to their control over the CMI enterprise—including (a) Vaynshteyn's participation in the operation and control of CMI, and (b) the unlawful channeling of CMI's professional proceeds to Vaynshteyn was not known to Allstate until shortly before it commenced this action.

**B.    CMIBK ENTERPRISE**

375.    McDonnell is registered with the State of New York as CMIBK's sole officer, director, and shareholder.

376.    Vaynshteyn induced McDonnell to cede control over the operation and management of CMIBK to Vaynshteyn during the relevant period.

377.    The documents created and filed with the State of New York related to CMIBK deliberately omitted any reference to Vaynshteyn's or Global Stone's involvement with CMIBK.

378.    Based on the representations contained within the documents filed with the State of New York on behalf of CMIBK, Allstate—even acting with reasonable diligence—could not

possibly have discovered the nature and extent of Vaynshteyn's domination and control over McDonnell and CMIBK.

379.     Vaynshteyn took purposeful steps to conceal his involvement in the day-to-day operations of CMIBK.  Further, he disguised payments of professional fees and profits (that he otherwise would not be eligible to receive) as legitimate costs for office space and equipment rental services.

380.     For instance, Vaynshteyn used a sham entity—i.e., Global Stone—for the purposes of controlling CMIBK and funneling professional fees and profits to himself for his own personal gain.

381.     Global Stone also was used by Vaynshteyn for the purpose of evading detection and preventing Allstate (or anyone else) from uncovering that Vaynshteyn operated, controlled, and profited from CMIBK.

382.     The purposeful concealment of Vaynshteyn's controlling interests in CMIBK allowed Vaynshteyn to unlawfully control CMIBK undetected.

383.     Overall, the purposeful concealment of Vaynshteyn's controlling interests in CMIBK enabled him to violate New York law while also preventing Allstate from discovering his unlawful acts for a prolonged period.

384.     At all relevant times during the operation of CMIBK, Vaynshteyn purposely caused CMIBK to falsely certify that it was eligible to be reimbursed under New York's No-Fault laws as a means to induce Allstate to promptly pay charges related to medical services purportedly provided to patients.

385.     Vaynshteyn used his roles as the owner, operator, agent, and/or employee of Global Stone to directly participate in the operation and management of the CMIBK enterprise.

386.    Because Vaynshteyn was not licensed to practice medicine, or allowed to operate, control, or profit from a professional corporation organized to provide professional physician services, and because CMIBK was organized as a physician-owned professional service corporation, Vaynshteyn was never lawfully entitled to participate in, or in any way direct, the operation and management of CMIBK.

387.    Accordingly, because Vaynshteyn unlawfully participated in the operation and management of CMIBK throughout the relevant period, CMIBK was caused to falsely claim eligibility for No-Fault reimbursement each and every time that it sought No-Fault reimbursement from Allstate.

388.    Further, McDonnell attested (or caused the attestation) to the medical necessity of the services allegedly performed in connection with CMIBK's patients.

389.    At all relevant times, McDonnell, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity.

390.    As alleged above, McDonnell (or those persons acting under his control) caused CMIBK to create and submit to Allstate treatment records and demands for payment relative to medical services that were (a) unnecessary, (b) charged at excessive rates, and (c) performed pursuant to an unlawful referral relationship.

391.    Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

392.    Many of these facts—particularly (a) Vaynshteyn's involvement in the direction and control of the diagnostic imaging purportedly rendered for CMIBK's patients, and (b) CMIBK's unlawful splitting of professional fees and profits with Vaynshteyn—including, but not necessarily limited to, through transactions between CMIBK and Global Stone—are not readily

evident within the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim.

393.    Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for treatment that was provided in accord with all applicable New York state licensing requirements.

394.    Thus, every time that McDonnell and Vaynshteyn caused CMIBK to submit No-Fault reimbursement demands to Allstate, Vaynshteyn and McDonnell (and those individuals working under their control) necessarily certified that CMIBK was eligible to be reimbursed under New York's No-Fault Laws.

395.    The full extent of Vaynshteyn's and McDonnell's fraudulent and unlawful acts relative to their control over the CMIBK enterprise—including (a) Vaynshteyn's participation in the operation and control of CMIBK, and (b) the unlawful channeling of CMIBK's professional proceeds to Vaynshteyn—including, but not necessarily limited to, through transactions that were structured between CMIBK and Global Stone—was not known to Allstate until shortly before it commenced this action.

**C.    GLOBAL STONE ENTERPRISE**

396.    Global Stone was used by Vaynshteyn for the purpose of evading detection and preventing Allstate (or anyone else) from uncovering that Vaynshteyn operated, controlled, and profited from CMIBK.

397.    Such concealment was necessary to perpetuate and preserve the Defendants' fraudulent scheme, which hinged upon Vaynshteyn's unlawful exertion of control over the operation and management of CMIBK because, at all relevant times, Vaynshteyn was not licensed to practice medicine in the State of New York, or allowed to operate, control, or profit from a professional corporation organized to provide medical services.

398.    Therefore, because CMIBK was organized as a physician-owned professional service corporation, Vaynshteyn was never lawfully entitled to participate in, or in any way direct, the operation and management of CMIBK.

399.    Therefore, to circumvent this prohibition, Vaynshteyn used Global Stone to unlawfully exert such control and siphon the professional fees and profits of CMIBK for his own personal use and benefit in violation of New York law.

400.    Overall, Vaynshteyn used Global Stone to serve as a vehicle to funnel and disguise payments from CMIBK as legitimate transactions when, in actuality, such payments were merely a means for Vaynshteyn to unlawfully share in CMIBK's professional medical fees and profits that he otherwise would not be eligible to receive.

401.    Therefore, Global Stone was used to lend an air of false legitimacy to the transactions between Global Stone and CMIBK when, in fact, Global Stone was intentionally used as a tool to conceal Vaynshteyn's involvement in the day-to-day operations of CMIBK.

402.    Consequently, McDonnell and Vaynshteyn's purposeful concealment of Vaynshteyn's controlling interests in CMIBK allowed Vaynshteyn to unlawfully control CMIBK undetected.

403.    The documents created and filed with the State of New York related to CMIBK deliberately omitted any reference to Vaynshteyn and Global Stone's involvement and thus gave no indication to Allstate or the general public that Vaynshteyn in any way maintained a controlling interest in CMIBK.

404.    At all relevant times, McDonnell, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity.

405.    Many of these facts—particularly (a) Vaynshteyn's participation in and control over the operation and management of CMIBK, and (b) CMIBK's unlawful splitting of professional medical fees and profits with Vaynshteyn through transactions between CMIBK and Global Stone are not readily evident within the documents submitted to Allstate by CMIBK and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim.

406.    Claims under New York's No-Fault laws can only be submitted, and reimbursed, for services that were provided in accord with all applicable New York state licensing requirements.

407.    Based on the above-described conduct, every time that McDonnell and Vaynshteyn caused CMIBK to submit No-Fault reimbursement demands to Allstate, McDonnell and Vaynshteyn (and those individuals working under their control) necessarily certified that CMIBK was eligible to be reimbursed under New York's No-Fault laws.

408.    The full extent of Vaynshteyn's fraudulent and unlawful acts relative to his participation in the Global Stone enterprise—including (a) Vaynshteyn's participation in and control over the operation and management of CMIBK through the Global Stone enterprise, and (b) the unlawful channeling of CMIBK's professional proceeds to Vaynshteyn through transactions that were structured between CMIBK and Global Stone—were not known to Allstate until shortly before it commenced this action.

## VIII.    ALLSTATE'S JUSTIFIABLE RELIANCE

409.    Each claim submitted to Allstate by (or on behalf of) CMI and CMIBK was verified pursuant to Insurance Law § 403.

410.    McDonnell, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity.

411.    To induce Allstate to promptly pay CMI's and CMIBK's patient invoices, the Defendants submitted (or caused to be submitted) to Allstate NF-3 forms certifying that CMI and CMIBK were eligible to be reimbursed under New York's No-Fault Laws.

412.    Further, to induce Allstate to promptly pay the fraudulent charges for the diagnostic medical imaging purportedly provided to patients of CMI and CMIBK, the Defendants hired attorneys to pursue collection of the fraudulent charges from Allstate.  These attorneys routinely file time-consuming and expensive lawsuits and arbitration matters against Allstate.

413.    Allstate is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially valid documents submitted to Allstate in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to, and did, cause Allstate to justifiably rely on them.

414.    At all relevant times, as alleged above, the Defendants concealed from Allstate the truth regarding CMI and CMIBK's reimbursement eligibility under New York law.

415.    In reasonable reliance on these misrepresentations, Allstate paid money to CMI and CMIBK to its detriment.

416.    Allstate would not have paid these monies had the Defendants provided true and accurate information about CMI and CMIBK's reimbursement eligibility under New York law, including the fact and necessity of the services provided.

417.    As a result, Allstate has paid in excess of $964,190.00 in reasonable reliance on the Defendants' false medical documentation and false representations regarding CMI and CMIBK's eligibility for reimbursement under New York's No-Fault Laws.

## IX.  DAMAGES

418.   The Defendants' pattern of fraudulent conduct injured Allstate in its business and property by reason of the aforesaid violations of state and federal law.  Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation (whereas Allstate's damages continue to accrue), Allstate's injury includes, but is not limited to, compensatory damages for payments in connection with first-party claims in excess of $964,190.00, the exact amount to be determined at trial, including:

(a)   Payments made to Community Medical Imaging, P.C. in connection with first-party claims in excess of $768,676.83, the exact amount to be determined at trial. The chart annexed at Exhibit 3, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Community Medical Imaging, P.C. in connection with first-party ("No-Fault") claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(b)   Payments made to Community Medical Imaging of Brooklyn, P.C. in connection with first-party claims in excess of $195,513.42, the exact amount to be determined at trial.  The chart annexed at Exhibit 4, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Community Medical Imaging of Brooklyn, P.C. in connection with first-party ("No-Fault") claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

## X.  CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### COMMUNITY MEDICAL IMAGING, P.C. ENTERPRISE
### (Against Andrew J. McDonnell, M.D. and Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn)

419.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-418 as if fully set forth herein.

420.   In furtherance of their operation and management of Community Medical Imaging, P.C. ("CMI"), Defendants Andrew J. McDonnell, M.D. and Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn (collectively, "Count I Defendants") intentionally caused to be prepared and mailed

false medical documentation in connection with Allstate insurance claims, in furtherance of their scheme to defraud.

421.     The Count I Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 1.

422.     Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

423.     Policies of insurance were delivered to insureds through the U.S. Mail.

424.     Payments made by Allstate to CMI traveled via the U.S. Mail.

425.     As documented above, the Count I Defendants repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms and other claim-related documentation to Allstate related to medical expenses and/or services that were purportedly performed at CMI, for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

426.     As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to CMI for the benefit of the Count I Defendants that would not otherwise have been paid.

427.     The Count I Defendants' pattern of preparing and mailing fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count I Defendants to continue this scheme without being detected.

428.    The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

429.    By creating and mailing to Allstate numerous fraudulent claims in an ongoing scheme, the Count I Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

430.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to CMI for the benefit of the Count I Defendants.

431.    Allstate is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

432.    CMI constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

433.    The Count I Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

434.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I Defendants' conduct.

435.    The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

436.    By virtue of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

**COUNT II**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**COMMUNITY MEDICAL IMAGING, P.C. ENTERPRISE**
**(Against Andrew J. McDonnell, M.D. and Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn)**

437. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-418 as if fully set forth herein.

438. Through their participation in the operation and management of Community Medical Imaging, P.C. ("CMI"), Defendants Andrew J. McDonnell, M.D. and Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn (collectively, "Count II Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

439. The Count II Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of CMI by means of a pattern of racketeering activity, including numerous acts of mail fraud as set forth in Exhibit 1, and through the preparation and/or submission of fraudulent insurance claim documents, including NF-3 forms, to Allstate.

440. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of CMI, even though CMI, as a result of the Count II Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

441. The Count II Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

442. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

443. By virtue of this violation of 18 U.S.C. § 1962(d), the Count II Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the

defendants identified three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT III
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### COMMUNITY MEDICAL IMAGING OF BROOKLYN, P.C. ENTERPRISE
### (Against Andrew J. McDonnell, M.D., Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn, and Global Stone Associates, Inc.)

444.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-418 as if fully set forth herein.

445.    In furtherance of their operation and management of Community Medical Imaging of Brooklyn, P.C. ("CMIBK"), Defendants Andrew J. McDonnell, M.D., Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn, and Global Stone Associates, Inc. (collectively, "Count III Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, in furtherance of their scheme to defraud.

446.    The Count III Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 2.

447.    Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

448.    Policies of insurance were delivered to insureds through the U.S. Mail.

449.    Payments made by Allstate to CMIBK traveled via the U.S. Mail.

450.    As documented above, the Count III Defendants repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms and other claim-related documentation to

Allstate related to medical expenses and/or services that were purportedly performed at CMIBK, for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

451.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to CMIBK for the benefit of the Count III Defendants that would not otherwise have been paid.

452.    The Count III Defendants' pattern of preparing and mailing fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count III Defendants to continue this scheme without being detected.

453.    The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

454.    By creating and mailing to Allstate numerous fraudulent claims in an ongoing scheme, the Count III Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

455.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to CMIBK for the benefit of the Count III Defendants.

456.    Allstate is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

457.    CMIBK constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

458.    The Count III Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

459.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III Defendants' conduct.

460.    The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

461.    By virtue of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

## COUNT IV
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### COMMUNITY MEDICAL IMAGING OF BROOKLYN, P.C. ENTERPRISE
**(Against Andrew J. McDonnell, M.D., Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn, and Global Stone Associates, Inc.)**

462.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-418 as if fully set forth herein.

463.    Through their participation in the operation and management of Community Medical Imaging of Brooklyn, P.C. ("CMIBK"), Defendants Andrew J. McDonnell, M.D., Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn, and Global Stone Associates, Inc. (collectively "Count IV Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

464.    The Count IV Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of CMIBK by means of a pattern of racketeering activity, including numerous acts of mail fraud as set forth in Exhibit 2, and through

the preparation and/or submission of fraudulent insurance claim documents, including NF-3 forms, to Allstate.

465.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of CMIBK, even though CMIBK, as a result of the Count IV Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

466.    The Count IV Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

467.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

468.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT V
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### GLOBAL STONE ASSOCIATES, INC. ENTERPRISE
### (Against Andrew J. McDonnell, M.D., Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn, and Community Medical Imaging of Brooklyn, P.C.)

469.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-418 as if fully set forth herein.

470.    In furtherance of their operation and management of Global Stone Associates, Inc. ("Global Stone"), Defendants Andrew J. McDonnell, M.D., Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn, and Community Medical Imaging of Brooklyn, P.C. (collectively, "Count V

94

Defendants") intentionally prepared and mailed (or caused to be prepared and mailed) false No-Fault claim reimbursement documentation in connection with Allstate insurance claims in furtherance of this scheme to defraud.

471.    The Count V Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 2.

472.    Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

473.    Policies of insurance were delivered to two or more Allstate claimants through the U.S. Mail.

474.    Payments made by Allstate to Community Medical Imaging of Brooklyn, P.C.—the proceeds of which were, in part, diverted to Global Stone for the benefit of one or more of the Count V Defendants—were delivered through the U.S. Mail.

475.    As documented above, the Count V Defendants repeatedly and intentionally submitted documentation to Allstate for medical expenses and/or services that were purportedly performed at Community Medical Imaging of Brooklyn, P.C. to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable No-Fault laws.

476.    The use of Global Stone's agreements with and relationship to Community Medical Imaging of Brooklyn, P.C. allowed Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn to exercise control over the operation and management of Community Medical Imaging of Brooklyn, P.C.,

and further permitted one or more of the Count V Defendants to share in the professional physician fees and profits collected by Community Medical Imaging of Brooklyn, P.C.

477. The use of Global Stone to siphon the professional physician fees and profits from Community Medical Imaging of Brooklyn, P.C. to Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn for his own personal use and financial gain was unlawful.

478. Overall, Community Medical Imaging of Brooklyn, P.C.'s relationship with Global Stone facilitated Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn's unlawful control over Community Medical Imaging of Brooklyn, P.C., and further rendered Community Medical Imaging of Brooklyn, P.C. ineligible to seek or collect No-Fault payments.

479. When the Count V Defendants mailed (or caused the mailing of) NF-3 forms and other claim-related documents to Allstate seeking No-Fault reimbursement, the Count V Defendants materially misrepresented Community Medical Imaging of Brooklyn, P.C.'s No-Fault reimbursement eligibility under New York law.

480. As a result of, and in reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to Community Medical Imaging of Brooklyn, P.C. for the benefit of one or more of the Count V Defendants that would not otherwise have been paid.

481. The Count V Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count V Defendants to continue perpetrating this scheme without being detected.

482.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

483.    By creating and then mailing to Allstate (or directing the creation and subsequent mailing to Allstate of) numerous fraudulent documents and other claim-related materials in an ongoing scheme, the Count V Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

484.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Community Medical Imaging of Brooklyn, P.C. for the benefit of one or more of the Count V Defendants.

485.    The unlawful activities alleged in this case also had the direct effect of causing these funds, including professional physician fees and profits, to be channeled to Global Stone, and then from Global Stone to one or more of the Count V Defendants for their own personal use and financial gain.

486.    Allstate is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

487.    Global Stone constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

488.    The Count V Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

489.    Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V Defendants' conduct.

490.    The Count V Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

491.    By virtue of the Count V Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, on behalf of Community Medical Imaging of Brooklyn, P.C., together with the costs of suit, including reasonable attorney's fees.

<div style="text-align:center">

**COUNT VI**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**GLOBAL STONE ASSOCIATES, INC. ENTERPRISE**
**(Against Andrew J. McDonnell, M.D., Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn,**
**and Community Medical Imaging of Brooklyn, P.C.)**

</div>

492.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-418 as if fully set forth herein.

493.    Through their participation in the operation and management of Global Stone Associates, Inc. ("Global Stone"), Defendants Andrew J. McDonnell, M.D., Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn, and Community Medical Imaging of Brooklyn, P.C. (collectively, "Count VI Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

494.    The Count VI Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Global Stone by means of a pattern of racketeering activity through Community Medical Imaging of Brooklyn, P.C., including numerous instances of mail fraud as set forth in Exhibit 2 and through the preparation and mailing of fraudulent documents and other claim-related documents, including NF-3 forms, to Allstate.

495.    The purpose of the conspiracy was to obtain, for Global Stone's benefit, No-Fault payments from Allstate on behalf of Community Medical Imaging of Brooklyn, P.C., even though Community Medical Imaging of Brooklyn, P.C., as a result of the Count VI Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

496.    The purpose of the conspiracy was also to cause professional physician fees and profits collected by Community Medical Imaging of Brooklyn, P.C. to be channeled to Global Stone for the benefit of one or more of the Count VI Defendants.

497.    The Count VI Defendants' use of Global Stone to funnel professional physician fees and profits from Community Medical Imaging of Brooklyn, P.C. to one or more of the Count VI Defendants was unlawful, and allowed the Count VI Defendants to exercise control over the operation and management of Community Medical Imaging of Brooklyn, P.C., and further permitted one or more of the Count VI Defendants to share in the professional physician fees and profits collected by Community Medical Imaging of Brooklyn, P.C.

498.    The Count VI Defendants were aware of these purposes, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

499.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

500.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VII
## COMMON LAW FRAUD
**(Against Community Medical Imaging, P.C., Andrew J. McDonnell, M.D., and Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn)**

501.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-418 as if fully set forth herein.

502.    Community Medical Imaging, P.C., Andrew J. McDonnell, M.D., and Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn (collectively, "Count VII Defendants") intentionally and knowingly made false and fraudulent statements of material fact to Allstate, and also concealed material facts from Allstate during the course of this scheme and in the course of their submission of bills seeking payment for medical services under New York's No-Fault laws.

503.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (a) in every claim, the representation that Community Medical Imaging, P.C. ("CMI") was properly licensed and therefore eligible to seek and collect No-Fault benefit payments under Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12) even though CMI was unlawfully owned and controlled by non-physicians; and (b) in every claim, the representation that CMI was eligible to seek and collect No-Fault benefit payments directly from Allstate under Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12) for the tests and treatment purportedly provided to Allstate claimants when, in fact, CMI was not eligible to seek or collect No-Fault benefit payments for these services because they were (i) not medically necessary, (ii) billed in violation of the applicable Fee Schedule, (iii) referred pursuant to unlawful arrangements with prescribing providers, and (iv) purposely designed to financially enrich one or more non-physician at the expense of patient care.

504.    The Count VII Defendants intentionally made the above-described false and fraudulent statements, and purposely concealed material facts for the purpose of inducing Allstate to pay charges submitted by (or on behalf of) CMI that were not compensable under New York's No-Fault laws.

505.    Allstate reasonably relied, to its detriment, upon the Count VII Defendants' material misrepresentations concerning CMI's eligibility to receive No-Fault reimbursement when making payments for medical services purportedly provided to patients through CMI.

506.    Allstate has been injured in its business and property by reason of the above-described conduct because Allstate has made No-Fault benefit payments totaling over $768,676.83 in connection with fraudulent bills submitted by the Count VII Defendants through CMI.

### COUNT VIII
### COMMON LAW FRAUD
**(Against Community Medical Imaging of Brooklyn, P.C.,
Andrew J. McDonnell, M.D., Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn, and Global
Stone Associates, Inc.)**

507.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-418 as if fully set forth herein.

508.    Community Medical Imaging of Brooklyn, P.C., Andrew J. McDonnell, M.D., Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn, and Global Stone Associates, Inc. (collectively, "Count VIII Defendants") intentionally and knowingly made false and fraudulent statements of material fact to Allstate, and also concealed material facts from Allstate during the course of this scheme and in the course of their submission of bills seeking payment for medical services under New York's No-Fault laws.

509.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (a) in every claim, the representation that Community Medical Imaging of Brooklyn, P.C. ("CMIBK") was properly licensed and therefore eligible to seek and collect No-Fault benefit payments under Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12) even though CMIBK was unlawfully owned and controlled by non-physicians; and (b) in every claim, the representation that CMIBK was eligible to seek and collect No-Fault benefit payments directly from Allstate under Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12) for

the diagnostic imaging services purportedly provided to Allstate claimants when, in fact, CMIBK was not eligible to seek or collect No-Fault benefit payments for these services because they were (i) not medically necessary, (ii) billed in violation of the applicable Fee Schedule, (iii) referred pursuant to unlawful arrangements with prescribing providers, and (iv) purposely designed to financially enrich one or more non-physician at the expense of patient care.

510.   The Count VIII Defendants intentionally made the above-described false and fraudulent statements, and purposely concealed material facts for the purpose of inducing Allstate to pay charges submitted by (or on behalf of) CMIBK that were not compensable under New York's No-Fault laws.

511.   Allstate reasonably relied, to its detriment, upon the Count VIII Defendants' material misrepresentations concerning CMIBK's eligibility to receive No-Fault reimbursement when making payments for medical services purportedly provided to patients through CMIBK.

512.   Allstate has been injured in its business and property by reason of the above-described conduct because Allstate has made No-Fault benefit payments totaling over $195,513.42 in connection with fraudulent bills submitted by the Count VIII Defendants through CMIBK.

<u>**COUNT IX**</u>
**UNJUST ENRICHMENT**
**(Against Community Medical Imaging, P.C., Andrew J. McDonnell, M.D., and Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn)**

513.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-418 as if fully set forth herein.

514.   As detailed above, Community Medical Imaging, P.C., Andrew J. McDonnell, M.D., and Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn (collectively, "Count IX Defendants") have engaged in improper, unlawful, and unjust acts, all to the harm and detriment of Allstate.

515.    The Count IX Defendants have been enriched at Allstate's expense through their receipt of payments made by Allstate in connection with the No-Fault claims submitted by (or on behalf of) Community Medical Imaging, P.C.

516.    The payments received by the Count IX Defendants constituted a benefit that they voluntarily and willingly accepted despite their commission of improper, unlawful, and unjust acts in furtherance of this scheme.

517.    The Count IX Defendants' retention of Allstate's payments violates fundamental principles of justice, equity, and good conscience.

518.    By reason of the improper, unlawful, and unjust conduct described throughout this Complaint, the Count IX Defendants have been unjustly enriched in an amount totaling $768,676.83, the exact amount to be determined at trial.

<div align="center">

**COUNT X**
**UNJUST ENRICHMENT**
**(Against Community Medical Imaging of Brooklyn, P.C., Andrew J. McDonnell, M.D., Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn, and Global Stone Associates, Inc.)**

</div>

519.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-418 as if fully set forth herein.

520.    As detailed above, Community Medical Imaging of Brooklyn, P.C., Andrew J. McDonnell, M.D., Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn, and Global Stone Associates, Inc. (collectively, "Count X Defendants") have engaged in improper, unlawful, and unjust acts, all to the harm and detriment of Allstate.

521.    The Count X Defendants have been enriched at Allstate's expense through their receipt of payments made by Allstate in connection with the No-Fault claims submitted by (or on behalf of) Community Medical Imaging of Brooklyn, P.C.

522.    The payments received by the Count X Defendants constituted a benefit that they voluntarily and willingly accepted despite their commission of improper, unlawful, and unjust acts in furtherance of this scheme.

523.    The Count X Defendants' retention of Allstate's payments violates fundamental principles of justice, equity, and good conscience.

524.    By reason of the improper, unlawful, and unjust conduct described throughout this Complaint, the Count X Defendants have been unjustly enriched in an amount totaling $195,513.42, the exact amount to be determined at trial.

## COUNT XI
### DECLARATORY JUDGMENT, 28 U.S.C. § 2201 and 2202
### (Against Community Medical Imaging, P.C.)

525.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-418 as if fully set forth herein.

526.    To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide professional medical services in New York.

527.    In view of its (a) illegal corporate structure, (b) unlawful control by one or more non-physician (i.e., Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn), (c) unlawful sharing of professional physician fees with one or more non-physician (i.e., Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn), (d) billing for medically unnecessary diagnostic medical imaging services, (e) billing for diagnostic imaging services referred pursuant to an unlawful arrangement with the prescribing provider, and (f) billing for diagnostic imaging services in violation of one or more rule applicable to such charges, Community Medical Imaging, P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to

provide professional medical services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to seek or collect any No-Fault benefit payments that were assigned to Community Medical Imaging, P.C. by its patients.

528.   Community Medical Imaging, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

529.   Community Medical Imaging, P.C. continues to challenge Allstate's prior claim denials.

530.   Community Medical Imaging, P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

531.   A justifiable controversy exists between Allstate and Community Medical Imaging, P.C. because Community Medical Imaging, P.C. rejects Allstate's ability to deny such claims.

532.   Allstate has no adequate remedy at law.

533.   Community Medical Imaging, P.C. will also continue to demand No-Fault benefit payments from Allstate absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by Community Medical Imaging, P.C.

534.   Accordingly, Allstate requests a judgment pursuant to Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 declaring that Community Medical Imaging P.C., at all relevant times, (a) was fraudulently incorporated, (b) was unlawfully owned, operated, managed, and controlled by one or more non-physician, (c) was engaged in the unlawful sharing of fees derived from the provision of professional physician services, (d) sought payment for medically unnecessary diagnostic imaging services, (e) sought payment for diagnostic imaging services referred pursuant

to an unlawful arrangement with the prescribing provider, and (f) submitted charges for diagnostic imaging services in violation of one or more rule applicable to such charges, and thus has no standing to submit or receive assigned No-Fault benefits.

**COUNT XII**
**DECLARATORY JUDGMENT, 28 U.S.C. § 2201 and 2202**
**(Against Community Medical Imaging of Brooklyn, P.C.)**

535.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-418 as if fully set forth herein.

536.    To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide professional medical services in New York.

537.    In view of its (a) illegal corporate structure, (b) unlawful control by one or more non-physician (i.e., Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn), (c) unlawful sharing of professional physician fees with one or more non-physician (i.e., Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn), (d) billing for medically unnecessary diagnostic medical imaging services, (e) billing for diagnostic imaging services referred pursuant to an unlawful arrangement with the prescribing provider, and (f) billing for diagnostic imaging services in violation of one or more rule applicable to such charges, Community Medical Imaging of Brooklyn, P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional medical services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to seek or collect any No-Fault benefit payments that were assigned to Community Medical Imaging of Brooklyn, P.C. by its patients.

538.     Community Medical Imaging of Brooklyn, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

539.     Community Medical Imaging of Brooklyn, P.C. continues to challenge Allstate's prior claim denials.

540.     Community Medical Imaging of Brooklyn, P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

541.     A justifiable controversy exists between Allstate and Community Medical Imaging of Brooklyn, P.C. because Community Medical Imaging of Brooklyn, P.C. rejects Allstate's ability to deny such claims.

542.     Allstate has no adequate remedy at law.

543.     Community Medical Imaging of Brooklyn, P.C. will also continue to demand No-Fault benefit payments from Allstate absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by Community Medical Imaging of Brooklyn, P.C.

544.     Accordingly, Allstate requests a judgment pursuant to Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 declaring that Community Medical Imaging of Brooklyn P.C., at all relevant times, (a) was fraudulently incorporated, (b) was unlawfully owned, operated, managed, and controlled by one or more non-physician, (c) was engaged in the unlawful sharing of fees derived from the provision of professional physician services, (d) sought payment for medically unnecessary diagnostic imaging services, (e) sought payment for diagnostic imaging services referred pursuant to an unlawful arrangement with the prescribing provider, and (f) submitted

charges for diagnostic imaging services in violation of one or more rule applicable to such charges, and thus has no standing to submit or receive assigned No-Fault benefits.

## X.  DEMAND FOR RELIEF

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### COMMUNITY MEDICAL IMAGING, P.C. ENTERPRISE
### (Against Andrew J. McDonnell, M.D. and Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn)

a.   AWARD Allstate's actual and consequential damages to be established at trial;

b.   AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c.   GRANT injunctive relief enjoining the Count I Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d.   GRANT all other relief this Court deems just.

### COUNT II
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### COMMUNITY MEDICAL IMAGING, P.C. ENTERPRISE
### (Against Andrew J. McDonnell, M.D. and Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn)

a.   AWARD Allstate's actual and consequential damages to be established at trial;

b.   AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c.   GRANT injunctive relief enjoining the Count II Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d.   GRANT all other relief this Court deems just.

## COUNT III
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### COMMUNITY MEDICAL IMAGING OF BROOKLYN, P.C. ENTERPRISE
**(Against Andrew J. McDonnell, M.D., Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn, and Global Stone Associates, Inc.)**

a.  AWARD Allstate's actual and consequential damages to be established at trial;

b.  AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c.  GRANT injunctive relief enjoining the Count III Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d.  GRANT all other relief this Court deems just.

## COUNT IV
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### COMMUNITY MEDICAL IMAGING OF BROOKLYN, P.C. ENTERPRISE
**(Against Andrew J. McDonnell, M.D., Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn, and Global Stone Associates, Inc.)**

a.  AWARD Allstate's actual and consequential damages to be established at trial;

b.  AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c.  GRANT injunctive relief enjoining the Count IV Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d.  GRANT all other relief this Court deems just.

## COUNT V
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### GLOBAL STONE ASSOCIATES, INC. ENTERPRISE
**(Against Andrew J. McDonnell, M.D., Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn, and Community Medical Imaging of Brooklyn, P.C.)**

a.      AWARD Allstate's actual and consequential damages to be established at trial;

b.      AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c.      GRANT injunctive relief enjoining the Count V Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d.      GRANT all other relief this Court deems just.

## COUNT VI
## VIOLATIONS OF 18 U.S.C. § 1962(d)
## GLOBAL STONE ASSOCIATES, INC. ENTERPRISE
**(Against Andrew J. McDonnell, M.D., Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn, and Community Medical Imaging of Brooklyn, P.C.)**

a.      AWARD Allstate's actual and consequential damages to be established at trial;

b.      AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c.      GRANT injunctive relief enjoining the Count VI Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d.      GRANT all other relief this Court deems just.

## COUNT VII
## COMMON LAW FRAUD
**(Against Community Medical Imaging, P.C., Andrew J. McDonnell, M.D., and Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn)**

a.      AWARD Allstate's actual and consequential damages to be established at trial; and

b.      GRANT all other relief this Court deems just.

### COUNT VIII
### COMMON LAW FRAUD
**(Against Community Medical Imaging of Brooklyn, P.C.,**
**Andrew J. McDonnell, M.D., Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn, and Global**
**Stone Associates, Inc.)**

a.      AWARD Allstate's actual and consequential damages to be established at trial; and

b.      GRANT all other relief this Court deems just.

### COUNT IX
### UNJUST ENRICHMENT
**(Against Community Medical Imaging, P.C., Andrew J. McDonnell, M.D., and**
**Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn)**

a.      AWARD Allstate's actual and consequential damages to be established at trial; and

b.      GRANT all other relief this Court deems just.

### COUNT X
### UNJUST ENRICHMENT
**(Against Community Medical Imaging of Brooklyn, P.C.,**
**Andrew J. McDonnell, M.D., Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn, and Global**
**Stone Associates, Inc.)**

a.      AWARD Allstate's actual and consequential damages to be established at trial; and

b.      GRANT all other relief this Court deems just.

### COUNT XI
### DECLARATORY JUDGMENT, 28 U.S.C. § 2201 and 2202
**(Against Community Medical Imaging, P.C.)**

a.      DECLARE that Community Medical Imaging, P.C., at all relevant times, has been

unlawfully organized, controlled, and/or operated by at least one non-physician,

and otherwise operated in violation of at least one New York state or local licensing

requirement necessary to provide professional physician services in New York;

b.      DECLARE that Community Medical Imaging, P.C.'s activities are unlawful;

c.      DECLARE that Allstate has no obligation to pay any past, present, or future No-Fault insurance claims submitted by Community Medical Imaging, P.C.; and

d.      GRANT all other relief this Court deems just.

**COUNT XII**
**DECLARATORY JUDGMENT, 28 U.S.C. § 2201 and 2202**
**(Against Community Medical Imaging of Brooklyn, P.C.)**

a.      DECLARE that Community Medical Imaging of Brooklyn, P.C., at all relevant times, has been unlawfully organized, controlled, and/or operated by at least one non-physician, and otherwise operated in violation of at least one New York state or local licensing requirement necessary to provide professional physician services in New York;

b.      DECLARE that Community Medical Imaging of Brooklyn, P.C.'s activities are unlawful;

c.      DECLARE that Allstate has no obligation to pay any past, present, or future No-Fault insurance claims submitted by Community Medical Imaging of Brooklyn, P.C.; and

d.      GRANT all other relief this Court deems just.

## XI.   **JURY TRIAL DEMAND**

The plaintiffs demand a trial by jury on all claims.

KING, TILDEN, MCETTRICK & BRINK, P.C.,

*/s/ Michael W. Whitcher*

_____
Nathan A. Tilden (NT0571)
ntilden@ktmpc.com
Michael W. Whitcher (MW 7455)
mwhitcher@ktmpc.com
Caitlin F. Keresey
ckeresey@ktmpc.com
100 Ring Road, Suite 211
Garden City, NY 11530
Ph:  (347) 710-0050

Attorneys for the Plaintiffs,
*Allstate Insurance Company,*
*Allstate Property & Casualty Insurance Company,*
*Allstate Indemnity Company, and*
*Allstate Fire & Casualty Insurance Company*

Dated: March 12, 2024