UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---

ALLSTATE INSURANCE COMPANY, ALLSTATE
INDEMNITY COMPANY, ALLSTATE FIRE &
CASUALTY INSURANCE COMPANY, and
ALLSTATE PROPERTY & CASUALTY
INSURANCE COMPANY,

                       Plaintiffs,

     -against-

COMMUNITY MEDICAL IMAGING, P.C.,
COMMUNITY MEDICAL IMAGING OF
BROOKLYN, P.C., ANDREW J. MCDONNELL,
M.D., GRIGORIY VAYNSHTEYN, a/k/a
GREGORY VAYNSHTEYN, and GLOBAL
STONE ASSOCIATES, INC.,

                       Defendants.
---

**MEMORANDUM & ORDER**
**24-CV-01832 (NGG) (LKE)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company (collectively, "Allstate" or "Plaintiffs") bring this action against Community Medical Imaging, P.C. ("CMI"), Community Medical Imaging of Brooklyn, P.C. ("CMIBK") (collectively, "PC Defendants"), Andrew J. McDonnell, M.D. ("McDonnell"), Grigoriy Vaynshteyn a/k/a Gregory Vaynshteyn ("Vaynshteyn"), and Global Stone Associates, Inc. ("Global Stone") (collectively, "Defendants"), alleging that Defendants defrauded Allstate in violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO," 18 U.S.C. § 1962(c), (d)), by submitting hundreds of fraudulent bills for no-fault insurance payments. (*See* Compl. (Dkt. 1) ¶¶

419-500.) Plaintiffs also allege common law fraud and unjust enrichment and seek a declaratory judgment as to all past, present, or future bills. (*Id.* ¶¶ 501-44.)

Before the court is Allstate's motion for a preliminary injunction to stay all 99 pending no-fault insurance collection arbitrations that PC Defendants commenced against Allstate. (*See* Not. of Mot. (Dkt. 24-1); Mot. to Stay (Dkt. 24-2) at 1 & n.1.) Additionally, Plaintiffs request that this court waive their obligation to post security for the injunction. (*See id.* at 23-24.) For the reasons set forth below, Plaintiffs' motion for injunctive relief is GRANTED and their request for oral argument is DENIED as moot. Allstate's request that the court waive their obligation to post security is also GRANTED.

## I. BACKGROUND[1]

### A. New York's No-Fault Insurance Scheme

Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law § 5101, *et seq.*), and the regulations promulgated pursuant thereto (N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") tit. 11 § 65, *et seq.*) (collectively, "the No-Fault Laws"), an automobile insurer is required to provide certain no-fault insurance benefits ("Personal Injury Protection" or "No-Fault benefits") to the individuals that they insure ("Insureds"). No-Fault benefits cover up to $50,000 per eligible person for reasonable expenses incurred for necessary medical services resulting from automobile accidents. *See* N.Y. Ins. Law § 5102(a)(1); 11 N.Y.C.R.R. § 65-1.1. This legislative scheme is designed to "ensure prompt compensation for losses incurred by accident victims without regard to fault or negligence, to reduce the burden on the courts and to provide substantial premium savings to New York motorists." *State Farm Mut. Auto. Ins. Co. v.*

---

[1] The following background is taken from the allegations of the Complaint and declarations submitted by Allstate in connection with this motion.

*Herschel Kotkes, M.D., P.C.*, No. 22-CV-03611 (NRM) (RER), 2023 WL 4532460, at *1 (E.D.N.Y. July 13, 2023)).[2]

Insureds may assign their No-Fault benefits to healthcare providers in exchange for services, and in turn, the provider, rather than the Insured, files no-fault claims with the insurance company directly. (Compl. ¶¶ 96-97.) *See also* 11 N.Y.C.R.R. § 65-3.11(a) (providing that the benefits may be paid only "directly to the applicant" or "upon assignment by the applicant . . . directly to providers of health care services"). Providers are prohibited from receiving No-Fault benefits, however, if they "fail[] to meet any applicable New York State or local licensing requirement necessary to perform such healthcare services." 11 N.Y.C.R.R. § 65-3.16(a)(12); *see also State Farm Mut. Ins. Co. v. Mallela*, 4 N.Y.3d 313, 320-21 (N.Y. 2005). This includes, *inter alia*, that unlicensed professionals, *i.e.*, non-physicians, may not own or control a medical professional corporation, serve as a director or officer of said corporation, enter into any agreements with the corporation's shareholders, or receive shares or otherwise derive economic benefit from the corporation's professional services. (Compl. ¶¶ 86-92); *see* N.Y. Bus. Corp. Law §§ 1507, 1508; New York Education Law § 6530(19); *see also Allstate Ins. Co. v. Lyons*, 843 F. Supp. 2d 358, 371 (E.D.N.Y. 2012). Licensed healthcare services providers, including physicians, are also prohibited from engaging in fraudulent activity, including ordering excessive tests or treatment not warranted by the condition of the patient, making material misrepresentations regarding a provider's eligibility to seek or collect payment under New York's No-Fault laws, and/or accepting kickbacks in exchange for patient referrals. (Compl. ¶¶ 94-109); *see, e.g.*, N.Y. Bus. Corp. Law §§ 1503, 1507; New York Education Law § 6530; N.Y. Ins. Law § 5102(a).

---

[2] When quoting cases, and unless otherwise noted, all citations and quotation marks are omitted, and all alterations are adopted.

3

Moreover, insurers are only given 30 days to review and investigate claims before paying those claims to avoid risk of penalty for denying or delaying a claim. *See* 11 N.Y.C.R.R. § 65-3.8(a); *see also Med. Soc'y of State v. Serio*, 100 N.Y.2d 854, 861 (N.Y. 2003). After 30 days, interest begins to accrue at a rate of two percent per month. *See* N.Y. Ins. Law § 5106(a). Claimants may dispute unpaid no-fault claims either in a state civil action or in an arbitration proceeding. *See* 11 N.Y.C.R.R. § 65-4.1, *et seq.*; N.Y. Ins. Law § 5106(a). In No-Fault collection actions, including arbitrations before the American Arbitration Association ("AAA"), the proceedings are conducted through "an expedited, simplified affair meant to work as quickly and efficiently as possible." *Allstate Ins. Co. v. Mun*, 751 F.3d 94, 99 (2d Cir. 2014). And these proceedings typically have "limited opportunities for pre-hearing discovery or examinations of witnesses during the hearing," which "can produce differing—and often inconsistent—results." (Michael Flaherty Declaration ("Flaherty Decl.") (Dkt. 24-3) ¶¶ 7-8.) Moreover, New York's No-Fault laws impose mandatory, non-refundable fees upon insurers to help fund the costs of the no-fault arbitration system. (*Id.* ¶ 19); *see* 11 N.Y.C.R.R. § 65-4.2(c)(1). These fees are apportioned to insurers based on the number of collection arbitrations filed against them, meaning that costs to the insurers increase with each new arbitration filed regardless of whether the insurer prevails in the action. (Flaherty Decl. ¶ 19); *see* 11 N.Y.C.R.R. § 65-4.2(c)(1).

### B. Operation of the Alleged Scheme

According to Allstate, the Defendants' fraudulent scheme began with Grigoriy Vaynshteyn, an unlicensed person who has been implicated in prior No-Fault schemes. (Compl. ¶¶ 38-40, 117 (citing no-fault cases).) Defendant Vaynshteyn initially managed and controlled Professional Health Radiology, P.C. ("PHR"), CMI's predecessor. (*Id.* ¶ 117.) "[O]n paper," PHR was owned by non-party Stewart Bakst, M.D. but "control over PHR's operation

4

and finances resided with Vaynshteyn." (*Id.* ¶ 118.) After PHR closed, Vaynshteyn arranged for McDonnell to purchase the assets of PHR. (*Id.* ¶¶ 119-20.) McDonnell worked for a different imaging provider, non-party Professional Health Imaging, P.C. ("PHI"), which was also allegedly controlled by unlicensed persons, including Vaynshteyn. (*Id.*) McDonnell purchased PHR's assets without conducting meaningful due diligence, which included a failure to investigate PHR's litigation history and a failure to obtain a fair market valuation of PHR. (*Id.* ¶¶ 121-22.)

Thereafter, PHR and PC Defendant CMI entered into an asset sale agreement. (*Id.* ¶ 124.) Plaintiffs assert this agreement was a "sham" for several reasons, including that (1) shortly after PHR purchased assets, including diagnostic imaging equipment, from Vaynshteyn for $360,000, it was then forced to sell the same equipment to CMI for $90,000—a fraction of the price and significantly below market value, (*id.* ¶¶ 125-26); (2) CMI never paid the $90,000 to PHR, (*id.* ¶ 127); (3) CMI began operating out of PHR's facility two months prior to the completion of the CMI-PHR asset sale, (*id.* ¶ 128);[3] (4) CMI was operated and controlled in the same manner as its predecessor, with Vaynshteyn managing the corporation without a formal hiring process, (*id.* ¶ 129); and (5) CMI retained all of PHR's employees, and even continued using the same phone number. (*Id.* ¶ 130.) More to the point, Allstate alleges that Vaynshteyn's personal accountant handled CMI's bookkeeping, Vaynshteyn's sister handled CMI's billing, and Vaynshteyn handled all other matters concerning personnel, negotiated leases, management of other locations, and even preparation of McDonnell for legal matters with insurance companies, amounting to his "total control" over CMI. (*Id.* ¶¶ 131-36.)

---

[3] CMI later moved from this facility in Rego Park, New York to a new facility located at 159-16 Union Turnpike, Fresh Meadows, New York ("Fresh Meadows Facility"). (*Id.* ¶¶ 117, 133.)

In late 2020, Vaynshteyn desired to "have a facility that was his and grow his own business," which led to the incorporation of the imaging facility, CMIBK, on or about May 18, 2021. (*Id.* ¶¶ 143-45.) CMIBK was located at 2102 Avenue Z, Brooklyn, New York ("Brooklyn Facility"). (*Id.* ¶ 145.) Vaynshteyn had his personal business corporation, Global Stone, serve as CMIBK's landlord at the Brooklyn Facility. (*Id.* ¶ 146.) Global Stone and CMIBK entered into a "medical diagnostic imaging facility, equipment and maintenance agreement," that "was designed such that Vaynshteyn could exert control over CMIBK through Global Stone, and gain ownership of the professional fees paid to CMIBK." (*Id.* ¶ 148). This agreement required CMIBK to pay Global Stone $50,000 a month for imaging facility space, medical imaging equipment, and maintenance services. (*Id.* ¶ 149.) While an opinion on the fair market value of the CMIBK-Global Stone agreement was sought, Allstate contends that the opinion was a "sham" designed only to create the illusion of an arms-length deal. (*Id.* ¶¶ 150-51.) Rather than being an arms-length deal, Allstate alleges that the marketing value was grossly overstated and that only sources of information used in the opinion were that of Vaynshteyn and Global Stone. (*Id.* ¶¶ 151-62.) Even assuming the opinion was based on credible data and assumptions, Allstate alleges that the entire process was "still a charade" as CMIBK began operating from the Brooklyn Facility location before having a fair market valuation, let alone a lease to use the space. (*Id.* ¶¶ 162-63.)

As to McDonnell—PC Defendants' only treating provider for the relevant period—Allstate alleges that he concurrently worked 300 miles away as a full-time medical officer at the Veterans Health Administration ("VHA") and at another imaging provider where he interpreted approximately 40 film per day. (*Id.* ¶¶ 137-38, 140, 142, 164.) He has additionally admitted that CMIBK was

managed by unlicensed persons in his absence, given McDonnell's VHA duties and other positions, and that Vaynshteyn's "main job" was manager of CMI. (*Id.* ¶ 167.)

### C. Evidence of the Alleged Scheme

Allstate alleges that Defendants were engaged in a scheme to submit fraudulent no-fault insurance claims through patient referrals to the PC Defendants. (*See id.* ¶¶ 178-203.) PC Defendants relied on these referrals to submit fraudulent bills to Allstate for medically unnecessary services, namely MRI services. (*Id.* ¶¶ 204-11.) Allstate notes that claimants were often referred to PC Defendants for early imaging without justification. (*Id.* ¶ 205.)

Further, Allstate alleges that the Defendants manipulated submission of charges to circumvent No-Fault laws providing for reductions in amounts charged for "Multiple Diagnostic Procedures." (*Id.* ¶ 292.)[4] Specifically, Allstate submits that PC Defendants would intentionally place seven-day buffers between MRIs to circumvent No-Fault laws triggering reductions in billing

---

[4] Under New York's No-Fault laws, healthcare providers and insurers look to the Workers' Compensation Fee Schedule ("Fee Schedule") to determine the level of reimbursement payable on legitimate claims. (*Id.* ¶¶ 105-07). The Fee Schedule also contains "Ground Rules" for billing radiology services like an MRI. (*Id.* ¶ 291.) Pursuant to Radiology Ground Rule 3(A)-(C), when 2 or more body parts are imaged in the same session, the provider must discount the procedure with the lesser fee by 50% (for 2 contiguous parts) or 25% (for 2 remote (*e.g.*, bilateral) parts or for 3 or more parts, whether contiguous or remote). (*Id.* ¶ 293.) For services rendered on or after October 1, 2020, Ground Rule 3(F) was amended to state that "Imaging studies taken within 7 days of the first x-ray/imaging studies and related to the injury or problem necessitating the first x-ray/imaging studies, and which could have been reasonably performed at one time, shall be subject to Radiology Ground Rule 3's discounting requirements." (*Id.* ¶ 295.) Courts have found that this discounting process reduces costs to consumers and discourages fraud. (*Id.* ¶ 294 (citing *Brentwood Pain & Rehab. Servs., P.C. v. Allstate Ins. Co.*, 508 F. Supp. 2d 278, 294 (S.D.N.Y. 2007).)

7

claims. (*See id.* ¶¶ 291-331.) Allstate also alleges that the PC Defendants created and submitted statutory claim forms (*i.e.*, NF-3 bills) that falsely certified their eligibility to collect No-Fault payments under New York law, even though they knew they were illegally operated and controlled and thus ineligible to collect No-Fault payments. (*Id.* ¶ 16.)

In support of their claims, Allstate has submitted evidence, in the form of tables and excerpted transcripts from legal proceedings, purporting to show the Defendants' fraudulent conduct. (*See generally id.*) For example, Allstate illustrates that CMIBK repeatedly submitted NF-3 forms listing Stewart Bakst, the previous owner of PHR, as its owner for claims submitted in 2022. (*Id.* ¶¶ 174-76.) Non-party Bakst, however, has been deceased since 2017—five years before CMIBK submitted these forms. (*Id.* ¶ 175.)

Allstate also provides "False Medical Billing Exemplars" that they claim demonstrate PC Defendants' fraudulent billing practices. (*Id.* ¶¶ 212-90.) Additionally, two tables appended to Allstate's Complaint identify 99 payments totaling $964,190.25 that Allstate has made to PC Defendants, and which Plaintiffs allege are fraudulent and non-compensable No-Fault claims. (*See* CMI Claims (Dkt. 1-5); CMIBK Claims (Dkt. 1-6).)

### D. Procedural History

Allstate commenced this action on March 12, 2024, alleging 12 causes of action, including violations of the RICO Act, 18 U.S.C. § 1962(c), (d), common law fraud, and unjust enrichment, and seeking damages in the amount of $964,190.00. (Compl. ¶¶ 418-524.) The Complaint also seeks declaratory relief in the form of judgments declaring that Defendants' "activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims[.]" (*Id.* ¶¶ 525-44.) On June 10, 2024, Allstate filed the instant fully briefed motion for injunctive relief. (*See* Mot. to Stay; Defs.' Opp. to Mot. to Stay ("Defs.' Opp.") (Dkt. 24-5); Reply (Dkt. 24-7).)

8

## II. LEGAL STANDARD

A party seeking a preliminary injunction must "demonstrate (1) irreparable harm absent injunctive relief; and (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor." *See Allstate Ins. Co. v. Elzanaty*, 929 F. Supp. 2d 199, 217 (E.D.N.Y. 2013). "Likelihood of success is not the focus at the early stages of a case such as this, because any likelihood of success inquiry would be premature. Instead, the Court looks to whether there is a serious question going to the merits to make them a fair ground for trial." *Id.*

## III. DISCUSSION

The courts in this district are acutely familiar with these actions, and have routinely granted injunctive relief for similar no-fault insurance fraud schemes. *See, e.g., Gov't Emps. Ins. Co. v. Q Pharmacy RX, Inc.*, No. 23-CV-9085 (ARR) (TAM), 2024 WL 3823491, at *6 (E.D.N.Y. Aug. 15, 2024); *Gov't Emps. Ins. Co. v. Clarke*, No. 23-CV-04605 (FB) (SJB), 2024 WL 2387788, at *3 (E.D.N.Y. May 23, 2024); *Allstate Ins. Co. v. Pierre*, No. 23-CV-06572 (NGG) (LB), 2024 WL 85088, at *8 (E.D.N.Y. Jan. 8, 2024); *Kotkes*, 2023 WL 4532460, at *13; *Gov't Emps. Ins. Co. v. Binns*, No. 22-CV-1553 (NGG) (PK), 2022 WL 4539361, at *10 (E.D.N.Y. Sept. 28, 2022); *Gov't Emps. Ins. Co. v. Landow*, No. 21-CV-1440 (NGG) (RER), 2022 WL 939717, at *14 (E.D.N.Y. Mar. 29, 2022); *Allstate Ins. Co. v. Metro Pain Specialists Pro. Corp.*, No. 21-CV-5586 (DG) (RER), 2022 WL 2467571, at *7 (E.D.N.Y. June 2, 2022); *Gov't Emps. Ins. Co. v. Relief Med., P.C.*, 554 F. Supp. 3d 482, 506 (E.D.N.Y. 2021); *Gov't Emps. Ins. Co. v. Wallegood, Inc.*, No. 21-CV-1986 (PKC) (RLM) (Dkt. 36), at 21 (E.D.N.Y. July 16, 2021); *Gov't Emps. Ins. Co. v. Beynin*, No. 19-CV-06118 (DG) (PK), 2021 WL 1146051, at *10 (E.D.N.Y. Mar. 25, 2021); *Gov't Emps. Ins. Co. v. Big Apple Med. Equip., Inc.*, No.

20-CV-5786 (PKC) (JRC) (Dkt. 52), at 22 (E.D.N.Y. Mar. 25, 2021); *Gov't Emps. Ins. Co. v. Wellmart RX, Inc.*, 435 F. Supp. 3d 443, 456 (E.D.N.Y. 2020); *State Farm Mut. Auto. Ins. Co. v. Parisien*, 352 F. Supp. 3d 215, 235 (E.D.N.Y. 2018). Upon review of the facts in this case, the same result is warranted here.

### A. Stay of All Pending and Future No-Fault Collection Arbitrations

Allstate asks this court to issue a preliminary injunction (1) staying all No-Fault collection arbitrations filed against Allstate by PC Defendants, and (2) enjoining PC Defendants (and their agents) from filing additional No-Fault collection arbitrations or lawsuits against Allstate until Allstate's declaratory judgment claims in this action are resolved. (Mot. to Stay at 1-2.)

#### 1. Irreparable Harm

A party seeking preliminary injunctive relief must show that "there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002). The harm "must be shown to be actual and imminent, not remote or speculative." *Id.*

Allstate argues that it will suffer irreparable harm because (1) there is a significant risk of inconsistent results in the arbitration proceedings, (2) the continued arbitration of the Defendants' No-Fault claims will waste resources, and (3) the potential for insufficient monetary compensation. (Mot. to Stay at 13, 16.)

The crux of Allstate's irreparable harm argument hinges on the risk of inconsistent outcomes resulting from the resolution of PC Defendants' pending and newly filed collection actions against Allstate. (Mot. to Stay at 16.) At the time of this filing, there were a total of 99 arbitrations pending between the parties—50 between CMI and Allstate, and 49 between CMIBK and Allstate. (*Id.*

at 14.) To the extent that inconsistent outcomes have occurred and continue to occur, and are given preclusive effect, Allstate argues it will be deprived of the opportunity to litigate significant portions of its fraud complaint absent the injunction. (*Id.* at 15.)

In response to Defendants argument that Allstate has failed to establish irreparable harm, Allstate points to several instances where inconsistent outcomes have already occurred involving these same claims billed by CMI and CMIBK. In relevant part, Allstate notes that it has "prevailed in several prior arbitrations" where evidence showed that CMI and CMIBK billed for medically unnecessary MRIs that were taken within days of the reported accident. (Reply at 3; *see also* Ex. 1 to Reply ("Example Allstate Arbitration Awards") (Dkt. 24-7) at ECF 13-27).) In other cases, however, arbitrators have ruled against Allstate, awarding Defendants with No-Fault payments and reaching opposite conclusions about the "medical necessity of the MRIs even when faced with nearly identical facts." (Reply at 3; *see also* Exs. 2 and 3 to Reply ("Example Defs. Arbitration Awards") (Dkt. 24-7) at ECF 29-48).) Accordingly, these examples show that inconsistent outcomes of arbitrations between Allstate and PC Defendants have occurred, and are likely to continue to occur.

Defendants attempt to challenge this argument by referencing *Gov't. Emps. Ins. Co. v. Mahmood*, where this court denied GEICO's request for injunctive relief, in part, because of the relatively small number of arbitrations involved. No. 23-CV-04388 (NGG) (TAM), 2024 WL 113958, at *6 (E.D.N.Y. Jan. 10, 2024). (*See* Defs.' Opp. at 10.) However, that case is distinguishable from the case at bar. In *Mahmood*, there were several factors the court considered in denying the plaintiffs motion for injunctive relief, including that many of the claims fell under New Jersey law that differs from that of New York's No-Fault regime, and the lack of evidence regarding the defendants' alleged fraud. 2024 WL 113958, at *7-8 (noting that in many no-fault insurance

11

fraud cases, there are allegations that defendants "practiced without a license; unlicensed laypersons illegally controlled their practices; or there were related criminal proceedings indicating that defendants operated a fraudulent enterprise" that were not present in *Mahmood*).

Here, however, Allstate has alleged that Defendant Vaynshteyn controlled PC Defendants as an unlicensed layperson that was unauthorized to practice medicine, (Compl. ¶¶ 2-3, 38, 42); that the PC Defendants used referring providers also known to be involved in No-Fault schemes, (*id.* ¶ 191 (citing cases)); and that the Defendants have been implicated in other No-Fault schemes, including actions both in this court and in New York state courts. (*See id.* ¶¶ 35, 40 (citing cases).) This evidence, as compared to that considered in *Mahmood*, is substantial and weighs in favor of injunctive relief.

Moreover, this court has previously opined that courts in this Circuit have yet to establish that irreparable harm turns on a precise number of inconsistent judgments. *See Gov't Emps. Ins. Co. v. Barakat*, 22-CV-07532 (NGG) (RML), 2024 WL 22769, at *6, n.5 (E.D.N.Y. Jan 2, 2024). Indeed, courts, including this one, have found irreparable harm where there were fewer than 99 pending cases. *See, e.g., id.* at *5-6 (finding that 43 pending no-fault arbitration actions risked inconsistent judgments); *Pierre*, 2024 WL 85088, at *5-6 (finding that 40 pending no-fault arbitration actions created a risk of inconsistent outcomes between the collection actions and the declaratory judgment at issue); *Relief Med., P.C.*, 554 F. Supp. 3d at 502-03 (finding that 39 pending arbitrations risked inconsistent judgments).

While it is true that Allstate is a "billion dollar company" as compared to the small PC Defendants here, that is not relevant to the court's assessment of Allstate's potential irreparable harm. (*See* Defs.' Opp. at 10.) As Defendants correctly note, Allstate does not

argue that its potential for financial harm is the result of Defendants' insolvency, but Allstate does argue that continued No-Fault arbitrations may cause, to an extent, irrecoverable financial loss. (*Id.*) Allstate alleges that PC Defendants "have no right to participate in the No-fault system," and thus for every mandatory, non-recoverable fee Allstate must pay whenever the Defendants file an arbitration with the AAA, and the attorney's fees Allstate must pay if Defendants prevail, that is evidence of irreparable harm absent a stay. (Mot. to Stay at 17.) Even so, the "[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury." *Gov't. Emps. Ins. Co. v. Mayzenberg*, 17-CV-2802 (ILG), 2018 WL 6031156, at *5 (E.D.N.Y. Nov. 16, 2018).

Here, Allstate has focused its motion for injunctive relief on the risk of inconsistent rulings, rather than solely focusing on unrecoverable damages or wasted time and resources spent on arbitration. (*See* Mot. to Stay at 13-17.) Taking these harms together, the court concludes that Allstate has sufficiently alleged irreparable harm.

### 2. Serious Question Going to the Merits

"District courts in the Second Circuit have generally found that likelihood of success is not the focus at the early stages of a case involving an alleged scheme to defraud an insurer of assigned no-fault benefits because any likelihood of success inquiry would be premature." *Relief Med., P.C.*, 554 F. Supp. 3d at 498. Instead, "the Court looks to whether there is a serious question going to the merits to make them a fair ground for trial." *Elzanaty*, 929 F. Supp. 2d at 217; *Kotkes*, 2023 WL 4532460, at *10. "A serious question can be found when a plaintiff has adequately detailed a complicated scheme of alleged fraud activity, and its request for relief does not rest on mere hypotheticals." *Metro Pain Specialists*, 2022 WL 2467571, at *5.

The Complaint and exhibits attached thereto provide a detailed review of the alleged No-Fault scheme sufficient to establish that there is a serious question going to the merits. Indeed, the Complaint alleges (1) that McDonnell, despite being the only licensed owner of the entities, had no real control over PC Defendants due to his general absence from the facilities, (Compl. ¶¶ 136-42, 164-65); (2) that non-physician Vaynshteyn unlawfully controlled CMI and CMIBK, as well as other facilities, (*id.* ¶¶ 117-36); (3) that CMIBK entered into a one-sided agreement with Global Stone (Vaynshteyn's company) for its facility and equipment needs and used a sham market value opinion to aid in that agreement, (*id.* ¶¶ 148-63); and (4) in operating the entities, Defendants falsified information, including using Stewart Bakst's name and credentials to submit medical claims long after Bakst's death, (*id.* ¶¶ 170-77), made unlawful patient referrals, (*id.* ¶¶ 178-203), and incurred fraudulent billing for unnecessary and excessive MRI services yielding hundreds of false claims submitted to Allstate in violation of various New York state licensing laws. (*Id.* ¶¶ 204-331, 418.)

The evidence presented is a far cry from "mere hypotheticals" and is more than sufficient to conclude that Allstate has raised serious questions going to the merits of its declaratory judgment claim. *See Parisien*, 352 F. Supp. 3d at 234.

### 3. Balance of Hardships

As the court finds that there are "serious question[s] going to the merits," it must further inquire as to whether that there is a "balance of hardships tipping decidedly" in Allstate's favor. *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). The court "need not pause on this question for long, as the irreparable harm factors discussed above also tip the equities squarely in [Plaintiffs'] favor." *Parisien*, 352 F. Supp. 3d at 234.

It is more efficient and will benefit both parties to adjudicate all pending claims in a single action. *See Elzanaty*, 929 F. Supp. 2d at 222 (noting that "all parties will benefit from having the issue of fraudulent incorporation determined in one action"). Moreover, if the preliminary injunction is granted and Allstate fails to prove its claims, "then, at worst, [Defendants'] recovery of the no-fault benefits to which they are entitled will be delayed but will come with accrued interest." *State Farm Mut. Auto. Ins. Co. v. Eclipse Med. Imaging, P.C.*, 700 F. Supp. 3d 4, 18 (E.D.N.Y. 2023). The court finds that the balance of hardships squarely in Allstate's favor.[5]

Accordingly, Allstate's motion to stay pending and future no-fault arbitration proceedings is GRANTED.

### B. Authority to Enjoin Future No-Fault Collection Lawsuits

In addition to the arbitration proceedings, Allstate seeks a stay enjoining Defendants from commencing any No-Fault insurance collection lawsuits against Plaintiffs pending the disposition of its declaratory judgment claim in this action. (Mot. to Stay at 12-13.)

The Anti-Injunction Act "bars a federal court from enjoining a proceeding in state court unless that action is expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." *Relief Med.,*

---

[5] The court notes—and rejects—Defendants' argument that injunctive relief would violate CMI's First Amendment rights such that the All-Writs Act must be invoked. (*See* Defs.' Opp. at 30-31.) Allstate's requested relief is only temporary, and the All-Writs Act provides for the issuance of injunctions where, as here, it is "necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case." *Parisien*, 352 F. Supp. 3d at 225.

*P.C.*, 554 F. Supp. 3d at 495 (quoting *Doc.'s Assocs., LLC v. Tripathi*, 794 F. Appx 91, 93 (2d Cir. 2019)). While the Anti-Injunction Act may limit federal district courts' authority to enjoin *pending* state court proceedings, *Mayzenberg*, 2018 WL 6031156, at *7 (citing 28 U.S.C. § 2283), there is no dispute that the Act does not "prevent a federal court from restraining a party from instituting *future* state proceedings." *Relief Med., P.C.*, 554 F. Supp. 3d at 496 (emphasis added) (collecting cases). Accordingly, courts look to the "traditional standards" for such injunctive relief. *Mayzenberg*, 2018 WL 6031156, at *9.

For the reasons already discussed, Allstate's motion to enjoin future state court collection lawsuits by Defendants pending disposition of the declaratory judgment action is therefore GRANTED.

### C. Security for the Injunction

Allstate also asks the court to waive the security requirement of Fed. R. Civ. P. 65(c), arguing that a bond is not needed here and that it is in the public interest to issue the requested injunction. (Mot. to Stay at 23-24.)

Rule 65(c) provides that "the court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Further, an exception to the bond requirement is available in cases pertaining to New York's no-fault insurance laws, and fraud against the healthcare system generally, implicate the "enforcement of public interests," an exception to Rule 65(c)'s requirement of security. *See Mayzenberg*, 2018 WL 6031156, at *10.

Allstate relies on *Mayzenberg* where the court explained that New York's No-Fault insurance statutes were "designed to protect accident victims regardless of fault by enabling them to obtain

necessary medical attention without concern of the ability to pay. It is of course in the public's interest to enforce those laws." *Id.* Additionally, Allstate argues that the issuance of injunction does not endanger the public interest because a stay Order will "stop ineligible providers from participating in the No-Fault system." (Mot. to Stay at 24.)

Defendants, on the other hand, argue that issuing a stay would infringe upon the Defendants' First Amendment rights, and thus harm the public interest, as well clog the federal courts whereas it is in the public's interest to encourage resolution of these claims in arbitration and state courts. (*See* Defs.' Opp. at 31-32.)[6]

The court has already rejected Defendants' First Amendment argument, *see supra* note 7, and finds their secondary argument without merit. Allstate undoubtedly has the ability to pay any and all eventual No-Fault awards, (*see* Mot. to Stay at 23), and this court has already determined that a preliminary injunction will not result in prejudice to the Defendants. *Barakat*, 2024 WL 22769, at *8. This court is well equipped to solve these claims and finds an injunction serves the public interest.

The court therefore WAIVES Rule 65(c)'s security requirement. Defendants' additional requests for a consolidated hearing and an expedited trial are DENIED. *See, e.g., Clarke*, 2024 WL 2387788, at *3.

## IV. CONCLUSION

For the reasons stated above, Allstate's motion for preliminary injunctive relief is GRANTED. All pending No-Fault collection arbitrations by Defendants CMI and CMIBK against Plaintiffs are

---

[6] The court notes it need not consider the public interest in this action involving private parties, *see Kelly v. Honeywell Int'l, Inc.*, 933 F.3d 173, 183-84 (2d Cir. 2019), but given the Defendants' assertion that the public interest will be harmed in the event of a stay, the court briefly considers the argument here, in the context of the security requirement.

stayed and Defendants are enjoined from filing any further No-Fault collection arbitrations or lawsuits against Allstate pending resolution of the instant federal action. Allstate's request that the court waive their obligation to post security is also GRANTED.

SO ORDERED.

Dated:   Brooklyn, New York
         August 28, 2024

                                           s/Nicholas G. Garaufis
                                           NICHOLAS G. GARAUFIS
                                           United States District Judge